James **HAYWOOD** and Cynthia Haywood, Plaintiffs,

v.

Kelly **NYE**, et al., Defendants.

Civil No. 2:95–CV–216C.

United States District Court,
D. Utah,
Central Division.

March 24, 1998.

John E. Hansen, Scalley & Reading, David L. Blackner, Law Offices of David L. Blackner, Salt Lake City, UT, for Plaintiffs.

Steven W. Allred, Salt Lake City Attorneys Office, Todd J. Godfrey, Mazuran & Hayes PC, Martha Stonebrook, Utah Attorney General's Office Litigation Unit, Patricia J. Marlowe, Salt Lake County Attorneys Office, Salt Lake City, UT, for Defendants.

## ORDER

CAMPBELL, District Judge.

This lawsuit arises out of the arrests of plaintiffs, James Haywood and Cynthia Haywood, in 1993. It is undisputed that the arrests of the plaintiffs were based on false information given to the individual defendants by David Tindall, a confidential informant. Plaintiffs claim that the arrests violated their constitutional rights and were motivated by racial prejudice. The plaintiffs also claim that the violations of their rights flow directly from the failure of the municipal defendants to formulate adequate policies concerning the use of confidential informants and to provide adequate supervision to officers in the field.

The individual defendants deny a racial motivation and maintain that no constitutional violations occurred. The individual defendants also claim immunity, both absolute and qualified. The municipal defendants claim that the plaintiffs have no evidence that the municipal policies were inadequate or caused the harm of which plaintiffs complain. All defendants have moved for summary judgment and the Salt Lake County defendants have moved for sanctions.

A hearing was held on the motions on January 14, 1998. Mr. David Blackner and Mr. John Hansen appeared on behalf of the plaintiffs, Mr. Steven Allred appeared on behalf of defendant Nye and defendant Salt Lake City, Ms. Sirena Wissler appeared on behalf of defendant Sterner and defendant Salt Lake County, and Mr. Frank Mylar appeared on behalf of defendants Benson and Lucey.

For the reasons set forth at the hearing, the court denies the motion for sanctions. Concerning the motions for summary judgment, the court now enters the following order after due consideration of the arguments of counsel, the memoranda of the parties, and applicable legal authorities.

### Standards and Mechanics of Summary Judgment.

Before the court can pass on a defendant's motion for summary judgment, the defendant must satisfy its burden of production. A defendant can meet this burden in one of two ways: by putting evidence into the record which affirmatively disproves an element of the plaintiff's case or by directing the court's attention to the fact that the plaintiff lacks evidence on an element of its claim. If the defendant opts to challenge the plaintiff's case in the latter fashion, it is clear, however, that conclusory assertions are insufficient to carry the burden of production. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 328, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (White, J., concurring) ("the movant must discharge the burden the Rules place upon him: It is not enough to move for summary judgment without supporting the motion in any way or with a conclusory assertion that the plaintiff has no evidence to prove his case"); *Windon Third Oil and Gas v. FDIC,* 805 F.2d 342, 345 n. 7 (10th Cir.1986) ("[C]onclusory assertions to aver the absence of evidence remain insufficient to meet this burden. Otherwise, as Justice Brennan cautioned, summary judgment '[would] be converted into a tool for harassment' ").

Once the movant has met the burden of production, summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Brown v. Royal MacCabees Insurance Co.,* 137 F.3d 1236, 1239–40 (10th Cir.1998); Fed. R.Civ.P. 56(c).

## Background

The court now turns its attention to the facts of this case in order to resolve the motions of the individual defendants. In its recitation of the events leading to this lawsuit, the court views all factual disputes (not only between the plaintiffs and defendants, but among the defendants themselves) in a light most favorable to the plaintiffs as the nonmoving parties. *Wolf v. Prudential Ins. Co. of America,* 50 F.3d 793, 796 (10th Cir. 1995).

### I. The Parties.

The Metropolitan Drug Enforcement Task Team ("Metro") was, prior to its dissolution, an interagency criminal task force that drew its personnel from various law enforcement organizations in the Salt Lake metropolitan area. Salt Lake City and Salt Lake County, both defendants in the present action, contributed officers from their respective police and sheriff departments to further Metro's operation. Defendant Kelly Nye was a Salt Lake City police officer operating through Metro. Defendant Gary Sterner was a Salt Lake County deputy sheriff also assigned to Metro. Defendants Leo Lucey and Ronald Benson were investigators with the Utah Department of Corrections ("UDC") who initiated the investigation of the plaintiffs. Although not formally assigned to Metro, Benson and Lucey worked with the agency in the investigation of the Haywoods.

James Haywood was, at the time of his arrest, employed by UDC as a correctional officer and recreational supervisor at the Utah State Prison. His wife, Cynthia Haywood, worked as a telecommunications analyst at the University of Utah. Both James and Cynthia Haywood are African–American.

### II. Events Leading Up to Metro's Investigation of the Haywoods.

#### A. Recruitment of Tindall by Benson.

In 1992, James Haywood filed a lawsuit against UDC, alleging racially discriminatory employment practices. Plaintiffs suggest that it was the institution of this lawsuit that gave rise to all the events described hereinafter.

In December 1992, defendant Benson arranged for the release of an inmate, David Tindall (also known as "Frosty the Snowman" or "Frosty" because of his cocaine habit), from the Utah State Prison so that he could serve as Benson's confidential informant.[1] Benson does not dispute that he arranged for Tindall to receive an apartment and living expenses in exchange for Tindall's services after Tindall's release from prison in February 1993. On February 26, 1993, Benson told Tindall that he wanted Tindall to help with a "sting operation" against the Haywoods. Benson requested that Tindall create phony audio tape recordings to incriminate the Haywoods. Benson also directed Tindall to find someone to impersonate Cynthia Haywood in a recorded drug transaction.

#### B. Tindall's Poor Performance as a Confidential Informant in Other Operations.

At around this same period of time, Benson, Lucey, Sterner, and Nye were using Tindall as a confidential informant in other Metro operations. Almost immediately, Tindall's behavior caused Nye to be "concerned"

---

1. Many of the facts regarding Tindall's service as a confidential informant come from a verified complaint filed by Tindall in his 1993 civil rights action against Benson. Because Tindall's complaint meets the requirements for an affidavit set forth in Fed.R.Civ.P. 56(e), the court must treat the matter contained therein as it would matter found in any other affidavit. *Hall v. Bellmon,* 935 F.2d 1106, 1111 (10th Cir.1991). The court cannot weigh the credibility of Tindall's complaint at this phase of the proceedings and must deny summary judgment to the individual defendants to the extent that Tindall's version of events, credible or not, materially conflicts with the defendants' accounts.

and raised "red flags" about Tindall's reliability. (Nye Dep. at 64.) The first drug sale arranged by Tindall as part of his cooperation with Metro involved an individual named Wendell Justice. The second sale was to a woman named Brenda Jackson. Problems arose during both of these transactions.

Nye testified that the transaction with Wendell Justice never came to a successful conclusion. Nye described the problems with Tindall: "Frosty wasn't being as compliant as he should be. That was really the first [investigation] that we were working with. He kept going over with Wendell where I couldn't hear what was going on." (*Id.* at 62, 70.)

The Brenda Jackson transaction raised more serious concerns about Tindall's reliability. The transaction between Jackson and Tindall took place on February 24, 1993. Tindall, under the direction of Nye, called Jackson and arranged to meet her in a Smith's parking lot to buy cocaine. Nye, Sterner, and Lucey were in the parking lot, in their vehicles, watching the drug sale. None of the officers knew Jackson, but relied on Tindall to identify her. Nye testified that when Jackson stopped and Tindall got in her vehicle, Nye was approximately twenty or thirty feet from Jackson's vehicle and "could see her pretty good." (*Id.* at 44.) According to Nye, Jackson then parked her vehicle behind Nye's and Nye watched the transaction through her rearview mirror. Nye testified that she was able to see Jackson's face. Nye particularly noticed a distinctive, "ugly" hat Jackson was wearing. (*Id.* at 44.) Nye testified that Lucey was closer to Jackson than she was and that Sterner "wasn't that far away." (*Id.* at 45).

When Tindall returned to Nye's vehicle after the drug sale, he gave Nye the two rocks of cocaine he had purchased from Jackson. Nye noticed that the rock cocaine was packaged in small packages, each package only large enough to hold one rock of cocaine. Nye had never seen cocaine packaged that way and found it "unusual." (*Id.* at 64.) Nye also saw that one of the rocks was smaller than the other and it appeared to her

that a piece of cocaine had been broken off the smaller rock. Nye suspected that Tindall had taken the cocaine for his personal use. She reported her suspicions to Benson, who then had Tindall tested for drug use. The results of the test showed that Tindall had, indeed, been using cocaine.[2]

### III. *The Investigation of the Haywoods.*

On the same day that Lucey, Sterner, and Nye observed the Tindall–Jackson buy, Lucey received another telephone call from Tindall. Tindall claimed that James Haywood had agreed to smuggle drugs into the prison and that "Cynthia Haywood" would be stopping by Tindall's apartment to pick up James Haywood's $75 fee. Lucey drove to Tindall's residence, gave Tindall the money, and waited in the parking lot until he saw "Cynthia Haywood" emerge from Tindall's residence. Aside from Tindall's representations, Lucey did not independently confirm that Tindall had spoken with James Haywood or that the woman he observed leaving Tindall's residence was Cynthia Haywood.

On February 26, Tindall again called Lucey and told him that "Cynthia Haywood" was demanding another $80 for James Haywood to smuggle drugs into the prison. Lucey delivered the money to Tindall, and, while at the apartment complex, saw a woman leaving the apartment. Tindall told Lucey that the woman was Cynthia Haywood. (Lucey Dep. at 59–60.)

Nye and Sterner also came to the parking lot in front of Tindall's residence to watch the transaction. As Nye watched, she saw that the woman who was supposed to be Cynthia Haywood was wearing the same distinctive, "ugly" hat that Brenda Jackson had worn two days earlier when Jackson had sold cocaine to Tindall. Nye wondered whether, in fact, the woman was Brenda Jackson, and not Cynthia Haywood, as Tindall claimed. (Nye Dep. at 91.) Concerned, Nye told Tindall, in the presence of Lucey, that the woman looked just like Brenda Jackson and that she was wearing the same kind of hat. She asked Tindall whether he was certain that

---

2. Although the exact date or dates when Tindall used cocaine remains uncertain on the record now before the court, it is undisputed that the

defendants were aware of Tindall's drug use at the time they applied for the Haywood arrest warrants on March 5.

the woman was Haywood. Tindall assured her that it was, and Lucey told Nye that he had seen the woman and that it was Cynthia Haywood. (*Id.*) According to Nye, despite Lucey's assurances, she was not completely certain that the woman was Haywood. (*Id.* at 96.) None of the members of the Metro team corroborated Tindall's identification of "Cynthia Haywood."

Later that same day, Tindall arranged by telephone to purchase $150 worth of cocaine from the woman that he claimed was "Cynthia Haywood." Tindall was given $200 from Metro funds to complete the transaction. The videotape of the incident is of such poor quality that it was impossible for the officers to make a positive identification of the woman claiming to be "Cynthia Haywood." The tape does show, however, that Tindall never received any change from the woman in his apartment. Officer Nye testified that she believed Tindall used the excess Metro funds "to buy his own little stash." (*Id.* at 89.) Importantly, when Tindall turned his purchase over to Metro, Nye saw that the cocaine Tindall claimed had been sold to him by Cynthia Haywood was in the same type of unusual packaging as the cocaine Tindall had purchased from Jackson two days earlier. Nye testified that, "It just kind of looked of fishy to me." (*Id.* at 64.)

IV. *The Application for the Arrest Warrants.*

On March 5, 1993, Nye and Sterner "screened" the Haywood cases with Deputy County Attorney Ruth J. McCloskey. The record now before the court suggests that Nye and Sterner may have informed McCloskey that they were using a confidential informant, but there is no evidence in the record that they made McCloskey aware of the nu-

merous "red flags" raised by Tindall's performance. (Nye Aff. at 4; Sterner Aff. at 5.[3]) Nor is there any evidence in the record that Nye or Sterner informed McCloskey of the fact that the entire investigation was based upon the uncorroborated statement provided by Tindall.

The probable cause statements prepared by the County Attorney's Office following the screening session were read and signed by Nye as affiant. The probable cause statement in support of the warrant application for James Haywood reads as follows:

THIS INFORMATION IS BASED ON EVIDENCE OBTAINED FROM THE FOLLOWING WITNESSES:

Det. Kelly Nye, Ron Benson, Leo Lucy, and David Tindell [sic].

Affiant, a detective with Metro–Narcotics Task Force, bases his information on report no. 93–21093 and conversations with police officers and other witness [sic] which indicate that at above time and places:

1. Defendant had conversations with a witness in which he agreed to transport cocaine and marijuana into the Utah State Prison.

2. Defendant agreed to and collected fees for the transaction and said that he paid others to assist him.[4]

(Exhibit A to Plaintiff's Opp. Mem.) Tindall is the "witness" whose uncorroborated statements provide the sole source of evidence that Haywood agreed to transport narcotics and that he received a fee for those alleged services. (Nye Dep. at 135.) Nothing is disclosed about Tindall's veracity, or lack of it, or about the basis of Tindall's knowledge of these activities.

---

**3.** Sterner also makes the conclusory statements in his affidavit, without giving details, that the probable cause statement (Sterner does not specify which probable cause statement) does not accurately reflect the information given to McCloskey by Nye. Sterner also alleges that Nye did not attempt to make false or misleading statements. (Sterner Aff. at 6–7.) These statements are of little or no evidentiary value or assistance. It should also be noted that in his deposition, Sterner testified that he remembered nothing about the questions McCloskey asked or what Nye or he may have told her. (Sterner Dep. at 51.) In a letter dated January 23, 1998,

counsel for the Salt Lake county defendants referred the court to a portion of an interview with McCloskey. As was stated in the hearing, this evidence is not properly before the court and will not be considered.

**4.** The referenced report in the probable cause statement for James Haywood, No. 93–21093, was the report of the drug sale between Tindall and the woman he claimed was Cynthia Haywood, but was, in fact, Brenda Jackson. (Nye Dep. at 132.) James Haywood is not mentioned once in report No. 93–21093.

The probable cause in support of the application for the Cynthia Haywood arrest warrant reads as follows:

THIS INFORMATION IS BASED ON EVIDENCE OBTAINED FROM THE FOLLOWING WITNESSES:

Det. Kelly Nye, Leo Lucy [sic], Ron Benson, David Tindell [sic], Ted Bazarnik and State Criminalist.

On February 26, 1993, at approximately 0910 hours at 3900 South 1300 West, in Salt Lake County, affiant purchased from the defendant, a substance which has been field tested by the State Crime Lab and found to be Cocaine, a Schedule II Controlled Substance.

(Exhibit A to Plaintiff's Opp. Mem.) This probable cause statement contains an obvious misstatement of material fact: Tindall, and not the "affiant," Nye, was the one who purchased drugs from "Cynthia Haywood." Like the probable cause statement for the James Haywood arrest warrant, nothing is included in this statement about Tindall's reliability or the basis of his knowledge. Moreover, in the case of Cynthia Haywood, there is no mention in the probable cause statement of the team's inability to make a positive identification of Cynthia Haywood:

Q You were not satisfied with just what you were seeing in the D.M.V. photo and on the video; correct?

A That's correct. Nobody was.

Q *Even though the arrest warrants had already been obtained at that point?*

A That's true. The arrest warrant had already been obtained at that point.

(Lucey Dep. at 70.) (emphasis added).

Based upon the probable cause statements submitted, Judge Reese issued warrants for plaintiffs' arrest.

## V. *The Arrest of Plaintiffs.*

On the evening of March 8, 1993, Nye and Lucey arrested Cynthia Haywood at her home. The officers took Cynthia Haywood to the offices of UDC and questioned her. Haywood adamantly denied selling cocaine to Tindall and, when shown photographs made from the video, insisted that she was not the woman in the photographs. Nye stated that at that point, it appeared to her that Haywood was being truthful. (Nye Dep. at 148–

49.) Nye stated that Sterner was present during this interview of Haywood and that Nye "probably" spoke to Benson and Lucey. (*Id.*) Notwithstanding these doubts about the correctness of the identity of Haywood as the person involved in the drug transaction, she was taken to jail.

James Haywood was also arrested, taken to UDC headquarters and subsequently booked into jail.

Immediately after Cynthia Haywood was taken to jail, Nye, Sterner and Benson went to Jackson's house. Nye admitted that the reason for going to Jackson's house was to "confirm" that Haywood was the woman involved in the drug transaction. (*Id.* at 149–50.) During the interview, Jackson stated that she was the woman in the photographs shown selling cocaine to Tindall. Jackson admitted that she had posed as Cynthia Haywood and that she had done so at the request of Tindall. (*Id.* at 152.) Later it was discovered that Tindall's claims that James Haywood had agreed to smuggle drugs inside the prison were also false. The charges against the Haywoods were subsequently dropped.

## *Analysis*

### VI. *Plaintiffs' Claims.*

The claims now pending before the court are as follows: both plaintiffs allege that Sterner, Benson, and Lucey violated their Fourth Amendment rights by arresting them without probable cause, and James Haywood asserts this claim against Nye as well (First Claim); both plaintiffs claim that Benson and Lucey violated their Fourteenth Amendment right to equal protection of the laws (Second Claim); both plaintiffs claim that Benson and Lucey maliciously prosecuted them (Third Claim); both plaintiffs have alleged that Sterner, Benson, and Lucey's actions were in furtherance of a conspiracy, motivated by racial animus, in violation of § 1985, and James Haywood asserts this claim against Nye as well (Fourth Claim); both plaintiffs claim that Salt Lake County failed to adequately supervise their officers and provide clear chains of command for their officers who were assigned to Metro, and James Haywood asserts this claim against Salt Lake City as well (Fifth Claim); and both plaintiffs

claim that Salt Lake County failed to adequately train their officers in the use of criminal confidential informants, with James Haywood asserting this claim against Salt Lake City as well (Fifth Claim).[5]

## VII. *Absolute Immunity.*

■ Nye first claims that she is entitled to absolute immunity for her actions in obtaining the arrest warrant against James Haywood. She asserts that in seeking the arrest warrant, she was, in effect, initiating a prosecution and therefore had absolute immunity for those actions. Nye's position cannot stand, particularly in view of the recent decision by the Supreme Court in *Kalina v. Fletcher,* ─── U.S. ───, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997). In *Kalina,* the Court denied a prosecuting attorney absolute immunity for her role in executing, under penalty of perjury, a "Certification for Determination of Probable Cause." The Court found that when the prosecutor signed the certification, she was acting as a witness, not an advocate, and that she was therefore not entitled to the absolute immunity given prosecutors performing "the traditional functions of an advocate." *Id.,* 118 S.Ct. at 510. Nye's claim of absolute immunity is denied.

## VIII. *Qualified Immunity.*

When a defendant raises the defense of qualified immunity, the court must examine a plaintiff's claims to determine whether the plaintiff has met his burden of establishing the inference that the defendant violated a constitutional right. If the court determines that the plaintiff has alleged a constitutional violation, the plaintiff must then prove that the right was clearly established at the time of the alleged violation. If the plaintiff succeeds on this issue as well, the qualified immunity defense generally will fail. The defendant may be entitled to qualified immunity at that point only if he can establish that "no material issues of fact remain as to whether the defendant's actions were objectively reasonable in light of the law and

information the defendant possessed at the time of his actions." *Salmon v. Schwarz,* 948 F.2d 1131, 1136 (10th Cir.1991).

A. *James Haywood's Fourth Amendment Claim Against Nye.*

1. *Did Nye Violate James Haywood's Fourth Amendment Rights?*

■ The first question presented is whether James Haywood has presented sufficient facts which, if found to be true at trial, would establish that Nye violated clearly established Fourth Amendment rights. "It is a violation of the Fourth Amendment for an arrest warrant affiant to 'knowingly, or with reckless disregard for the truth,' include false statements in the affidavit, *Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), or to knowingly or recklessly omit from the affidavit information which, if included, would have vitiated probable cause, *Stewart v. Donges,* 915 F.2d 572, 581–83 (10th Cir.1990)." *Wolford v. Lasater,* 78 F.3d 484, 489 (10th Cir.1996).

Here, the evidence is undisputed that the affidavit signed by Nye in support of the arrest warrant for James Haywood omitted substantial amounts of information. Nye swore in the affidavit that "Defendant agreed to and collected fees for the transaction and said that he paid others to assist him." Missing from this statement is the crucial fact that Tindall's uncorroborated statement was the sole source of this information. The affidavit also recites: "Defendant had conversations with a witness in which he agreed to transport cocaine and marijuana into the Utah State Prison." Although it is disclosed that the information was obtained from a witness, nothing is revealed about the witness, Tindall.

Having found that the affidavit omitted information, the next step in the analysis requires that the court examine the affidavit to determine whether inclusion of that information would have vitiated probable cause.

---

5. Cynthia Haywood settled all claims against Nye and Salt Lake City. Both plaintiffs voluntarily dismissed their claims against Sterner alleging violations of § 1983 based on the denial of equal protection of the laws and malicious prosecution, and James Haywood also voluntarily dismissed these same claims against Nye. The plaintiffs also dismissed their claims against Salt Lake City and Salt Lake County alleging that the municipalities had failed to train their officers to recognize the existence of probable cause.

*Wolford,* 78 F.3d at 489. Because Tindall was the sole source of the information in the affidavit, and there was no independent corroboration of the information provided by him, probable cause will exist only if the issuing judge could have found that Tindall was a reliable witness with an adequate foundation for his claims. *See Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ("The task of the issuing magistrate is simply to make a practical, common-sense decision whether [probable cause exists in light of] all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information.") (internal citation omitted). *See also United States v. Wilhelm,* 80 F.3d 116, 119–120 (4th Cir.1996) (finding no probable cause established by affidavit where informant is not named and no information is given about the informant's reliability other than conclusory assertions of truthfulness) (collecting cases).

The question, then, is whether, if all the information known to Nye about Tindall had been disclosed to the issuing magistrate, Tindall's reliability would have been sufficiently established that probable cause could have been premised solely on his uncorroborated information. Although the defendants have made conclusory allegations that Tindall had shown himself to be reliable and trustworthy before the warrants for the arrest of the Haywoods were sought, the evidence before the court shows the contrary. Nye admitted that Tindall's performance raised "red flags" early on. When Nye signed the affidavit, she knew that Tindall had not been "compliant" in the Wendell Justice transaction, that he was keeping excess Metro funds that were given to him for use in drug transactions, that he was continuing to use drugs (a violation of his parole), and, in fact, had probably taken and used cocaine from the Brenda Jackson drug transaction. Nye also had serious doubts about the reliability of Tindall's identification of "Cynthia Haywood." In light of this information, the court concludes that Tindall was so unreliable that probable cause for the arrest of James Haywood could not rest solely upon his uncorroborated statements.

■ The next question is whether Nye signed the affidavit either knowing of the omitted statements or with reckless disregard for the truth. It is not disputed that Nye knew that Tindall was the sole source of the information in the affidavit nor is it disputed that Nye knew of the problems with Tindall. Yet the affidavit Nye signed gave no indication of these problems. This is sufficient to meet the burden of establishing that Nye acted knowingly or recklessly. *See Salmon v. Schwarz,* 948 F.2d 1131, 1140 (10th Cir.1991) ("Reckless disregard for the truth can be inferred where the circumstances provide obvious reasons for doubting the truthfulness of the allegations.") (internal citations omitted). The court therefore concludes that Nye violated James Haywood's rights by recklessly or intentionally submitting a probable cause statement to Judge Reese that contained numerous material omissions.

### 2. Was the Law Clearly Established in 1993 That False Statements and Material Omissions in an Arrest Affidavit Violated the Fourth Amendment?

■ Constitutional law in this circuit is considered to be clearly established if " 'there [is] a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts ... have found the law to be as the plaintiff maintains.' " *Nash v. Fields,* 134 F.3d 383, 1998 WL 33868 (10th Cir.1998) (quoting *Medina v. City and County of Denver,* 960 F.2d 1493, 1498 (10th Cir.1992)). The Tenth Circuit held prior to 1993 that false statements and material omissions in an arrest affidavit violate the Fourth Amendment. *See Salmon v. Schwarz,* 948 F.2d 1131, 1139 (10th Cir. 1991). Therefore, Nye may not have qualified immunity for her violation of clearly established law unless she can show extraordinary circumstances which would nevertheless make her actions objectively reasonable. *V–1 Oil Co. v. State of Wyoming,* 902 F.2d 1482, 1488 (10th Cir.), *cert. denied,* 498 U.S. 920, 111 S.Ct. 295, 112 L.Ed.2d 249 (1990).

### 3. Has Nye Shown the Existence of Extraordinary Circumstances?

■ Defendant Nye suggests that her participation in the screening process and her

reliance on the affidavits prepared by the County Attorney's office makes her actions objectively reasonable. It is true that reliance on the advice of counsel may rise to the level of extraordinary circumstances. *Id.* Whether advice of counsel can shield Nye from liability for violations of clearly established law in this case depends upon consideration of four factors: "(1) how unequivocal and specifically tailored to the particular facts giving rise to the controversy the advice was, (2) whether complete information had been provided to the advising attorney(s), (3) the prominence and competence of the attorney(s), and (4) how soon after the advice was received the disputed action was taken." *Id.* at 1489 (internal citations omitted).

Considering these factors, the court finds that Nye has not met her burden of showing extraordinary circumstances. First, there is nothing in the record which shows that Nye made complete disclosure to McCloskey, including the problems presented by Tindall. Second, it is quite clear that Nye did not ask for, and McCloskey did not give, "advice." That is, Nye did not ask whether it was permissible to omit material information about a confidential informant from the probable cause statement. McCloskey did not advise Nye that such actions would withstand judicial scrutiny. There is simply no way to construe the clerical errors of the county attorney's office in preparing the probable cause statement, if indeed the omissions arose from such errors (as the defendants claim), as "unequivocal" and "specifically tailored" advice to Nye that she could ignore the constitutional decisions of the Tenth Circuit and the United States Supreme Court. Nothing that McCloskey said to Nye relieved Nye of her obligation to review the truthfulness of the probable cause statement before attesting to it. Therefore, with the evidence now before it, the court must conclude that there were no extraordinary circumstances sufficient to relieve Nye of liability. Accordingly, Nye's motion for summary judgment based on qualified immunity is denied.

### B. *Plaintiffs' Fourth Amendment Claims Against Defendant Benson.*

As the court explained earlier, the sworn complaint of David Tindall alleges that defendant Benson engaged in a deliberate conspiracy to frame the Haywoods for distributing narcotics. The complaint includes allegations that Benson ordered Tindall to manufacture evidence against both James and Cynthia Haywood, and then allowed this evidence to be used to obtain arrest warrants. If these facts are found to be true, Benson will have no immunity for his actions. Because the court finds that the verified complaint is sufficient to defeat summary judgment on the Fourth Amendment claims, none of the other evidence against Benson need be considered.

### C. *Plaintiffs' Fourth Amendment Claims Against Defendant Lucey.*

■ Defendant Lucey maintains that he is entitled to qualified immunity under the "extraordinary circumstances" prong of the qualified immunity analysis because he did not apply for the arrest warrants for either of the Haywoods and relied on a "facially valid warrant" to effect their arrest. This analysis is far too simple and ignores certain essential facts.

As discussed above, the information known to the officers at the time of the issuance of the warrant for James Haywood did not support a finding of probable cause for his arrest. The lack of probable cause for the arrest of Cynthia Haywood is even more striking. Although Lucey disputes many of the statements that Nye made in her deposition, Nye testified that she told the other officers, including Lucey, about the difficulties of identifying Cynthia Haywood and the problems with Tindall. Nye testified that when she expressed her doubts to Sterner and Lucey about the identity of the woman who had sold drugs to Tindall, Lucey assured her that the woman was, in fact, Cynthia Haywood. Nye testified that she had told Lucey of her suspicions concerning Tindall's drug use. Most important, Lucey admitted in his deposition testimony that even after the arrest warrant for Cynthia Haywood had been obtained, "nobody" believed that a proper identification of Cynthia Haywood had been made through comparison of a driver's license photograph and pictures made from the video of the drug transaction. (Lucey Dep. at 69–70.)

It appears to the court that there remains a genuine factual issue as to whether, despite the authorization of a magistrate, a reasonably well-trained officer could have believed that probable cause for the arrest of either James or Cynthia Haywood existed. *See Salmon v. Schwarz*, 948 F.2d 1131, 1136 (10th Cir.1991). In *Salmon*, the Tenth Circuit affirmed the denial of summary judgment to an officer who applied for an arrest warrant but directed the entry of summary judgment for the defendants who had simply executed the warrant. In *Salmon*, unlike the case now before this court, there was no evidence that the defendants who served the warrant had any knowledge that would have vitiated probable cause or their good faith reliance on the arrest warrant. *Id.* at 1141. Here, plaintiffs have presented sufficient evidence to raise a triable issue: whether Lucey knew at the time the warrants were executed that Tindall was unreliable and that Tindall's statements were uncorroborated. Lucey therefore has not met his burden of showing that his actions were objectively reasonable as a matter of law in light of the knowledge he possessed at the time of the arrests. Lucey's motion for summary judgment based on qualified immunity is denied as to both plaintiffs' Fourth Amendment claims.

### D. *Plaintiffs' Fourth Amendment Claims Against Defendant Sterner.*

The same analysis that applied to Lucey's claim of qualified immunity bars a grant of qualified immunity to Sterner. Again, it is evident that Sterner was aware of difficulties with Tindall and the lack of independent corroboration of any of the information provided by Tindall. The extent of his knowledge about the problems with the investigation remains uncertain. These factual disputes preclude this court from ruling as a matter of law that Sterner possessed so little awareness of the problems presented by the Haywood investigation that his reliance on the arrest warrant was objectively reasonable. Accordingly, summary judgment is denied Sterner on his claim for qualified immunity.

### IX. *Plaintiffs' § 1983 Malicious Prosecution Claim Against Benson and Lucey.*

■ Plaintiffs have asserted that defendants Benson and Lucey are liable under § 1983 based on a claim of malicious prosecution. The defendants have moved for summary judgment on this claim on the ground that it fails to state a cause of action. However, the Tenth Circuit has, in *Taylor v. Meacham*, 82 F.3d 1556, 1561 (10th Cir.1996), held that a claim for malicious prosecution can be a basis for a § 1983 liability. The court stated that to succeed on such a claim, a plaintiff must establish a violation of the Fourth Amendment as well as the common-law elements of malicious prosecution.

The elements of malicious prosecution are: (1) defendants initiated or procured the prosecution against an innocent plaintiff; (2) defendants did not have probable cause to initiate the prosecution; (3) defendants initiated the prosecution primarily for a purpose other than that of bringing an offender to justice; and (4) the prosecution terminated in favor of the plaintiff. *Hodges v. Gibson Products Co.*, 811 P.2d 151, 156 (Utah 1991). There appears to be no dispute that the first and fourth elements are met. The court has concluded that the defendants did not have probable cause to initiate the prosecution; therefore the second element is fulfilled. With regard to the last remaining element, improper purpose, the defendants have made no showing, either affirmatively or by pointing to a failure of plaintiff's evidence. Accordingly, Benson and Lucey's motion for summary judgment on this claim is denied.

### X. *Plaintiffs' § 1985 Racial Conspiracy Claims.*

■ In order to establish the existence of a conspiracy under § 1985(3), the plaintiffs must show "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action . . . ." *Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971).

Plaintiffs have no direct evidence of racial animus on the part of the defendants. Plaintiffs' counsel stated at the hearing: "There is not direct evidence of racial animus . . . . With respect to evidence of racial animus, I

submit that ... circumstantial evidence is enough." (Tape Recording of 9/14/98 Hearing.) In order to sustain their claim for racial conspiracy, the plaintiffs therefore ask the court to draw the inference that the defendants were retaliating against Mr. Haywood for filing his racial discrimination claim. For the reasons stated below, however, the court declines the plaintiffs' invitation.

Even on a motion for summary judgment, where the court is obliged to draw all *reasonable* inferences on behalf of the nonmoving party, it would be purest speculation on this record to assume that the defendants intended to punish Mr. Haywood for filing his racial discrimination lawsuit. As Judge Kelly recently stated:

> Although we must draw all factual inferences in favor of the nonmovant, those inferences must be reasonable. [The testimony of plaintiff's expert], grounded in speculation, may raise an inference [in plaintiff's favor], but it is not sufficient to withstand summary judgment. Rather, this inference, if it can be so called, constitutes at best, a "mere scintilla" of evidence, on which a judgment in favor of the nonmovant cannot be upheld.

*Allen v. Muskogee, Oklahoma,* 119 F.3d 837, 846 (10th Cir.1997) (Kelly, J., dissenting in part).

In this case, Nye and Lucey testified that at the time the Haywoods were arrested they did not know of James Haywood's lawsuit. (Nye Dep. at 166–67; Lucey Dep. at 70.) Nye also testified that during the investigation of the Haywoods, she never heard anyone speak in a derogatory manner about African–Americans. (Nye Dep. at 166–67.) There is no other evidence in the record touching on racial animus on the part of the defendants. In short, there is no evidence in the record to show that the defendants were even aware of Mr. Haywood's lawsuit, much less motivated to falsely arrest him because of it. The defendants' motion for summary judgment is granted with regard to this claim.[6]

---

**6.** The resolution of this claim differs from the municipal liability claims, discussed in Section XII, *infra,* because the court itself inquired what evidence the plaintiffs possessed on this issue.

## XI. *Plaintiffs' § 1983 Equal Protection Claims Against Benson and Lucey.*

The court dismisses plaintiffs' equal protection claims for the same reason that it dismissed the racial conspiracy claims: there is no evidence in the record from which the court could draw a reasonable, nonspeculative inference that the defendants were motivated by racial considerations. Additionally, the court notes that plaintiffs failed to offer any argument in opposition to Benson and Lucey's motion for summary judgment on this claim.

## XII. *The Municipal Defendants' Failure to Satisfy the Burden of Production.*

Because the municipal defendants' motions for summary judgment must be denied for failure to meet the burden of production, the court begins its discussion with a more detailed exploration of the mechanics of summary judgment.

### A. *Defendants May Prevail By Affirmatively Disproving an Element of the Plaintiffs' Case.*

■ The United States Supreme Court explained the two methods by which a party moving for summary judgment may discharge its burden of production in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In the first instance, the burden may be discharged by placing evidence into the record which affirmatively disproves an element of the nonmoving party's case. *Id.* at 331 (Brennan, J., dissenting). For example, where, as here, the plaintiffs have alleged an inadequate municipal policy leading to a constitutional violation, the defendants could satisfy their burden simply by putting their policies into the record. Then the court, after reviewing the record, may be in a position to find the policies adequate as a matter of law, or to rule that the policies could not have caused the harm of which the plaintiffs complain. Having heard the plaintiffs' response, the court is now in an adequate position to evaluate the legal sufficiency of the plaintiffs' case.

B. *Defendants May Also Prevail By Showing the Court That They Have Examined the Evidence in the Plaintiffs' Possession and That the Plaintiffs Lack Sufficient Evidence on Some Element of Their Case.*

 The defendants need not affirmatively disprove the plaintiffs' case, however; "we find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323 (emphasis in original). A defendant may move for summary judgment simply on the ground that the plaintiff lacks evidence "sufficient to establish the existence of an element essential to that party's case." *Id.* at 322.

The defendant in *Celotex,* for instance, propounded interrogatories which asked the plaintiff to identify all of her evidence on a key element of the case. *Catrett v. Johns–Manville Sales Corp.,* 826 F.2d 33, 34–35 (D.C.Cir.1987) (on remand). The Supreme Court held that the defendant had properly moved for summary judgment when the plaintiff failed to respond, by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file . . .' which it believe[d] demonstrate[d] the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323 (quoting Fed. R.Civ.P. 56(c)).

In his concurring opinion (which provided the majority's fifth vote), Justice White further elaborated the principle that the defendant must point the court to specific portions of the record where the plaintiff has admitted that he has no evidence or intends to rely on evidence which is insufficient as a matter of law:

A plaintiff need not initiate any discovery or reveal his witnesses or evidence unless required to do so under the discovery Rules. . . . [H]e need not . . . depose his witnesses or obtain their affidavits to defeat a motion for summary judgment asserting only that he has failed to produce any support for his case. It is the defendant's task to negate, if he can, the claimed basis for the suit.

*Celotex,* 477 U.S. at 328 (White, J., concurring). Under Justice White's analysis, where

the defendant has posed no discovery requests, silence in the record could reveal weaknesses in the plaintiff's case, or it could simply reveal that the defendant has not asked for information which the plaintiff, in fact, possesses.

Under the guidance provided by the Supreme Court, it is clear that the defendants in this case must make some effort to determine the nature of the evidence in the plaintiffs' possession before moving for summary judgment on the ground that the plaintiffs have no evidence. For example, the defendants could propound interrogatories requesting that the plaintiffs identify all evidence in their possession which shows that the municipal policies are inadequate or that the municipal policies caused the plaintiffs' injuries. Once the plaintiffs respond to such interrogatories (or do not respond at all), the defendants are in a position to discharge their burden of production by "'showing'— that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case" or that what evidence exists is legally insufficient. *Id.* at 325.

C. *The Municipal Defendants in This Case Have Failed Either to Negate An Element of the Plaintiffs' Claim or to Establish that the Plaintiffs Have No Evidence.*

 The reason for imposing such a burden of production becomes readily apparent on the record now before the court. The municipal defendants did not attempt to put their own policies into the record or to otherwise negate an element of the plaintiffs' claims. Instead, they opted to attack the sufficiency of the plaintiffs' evidence. Having chosen this permissible line of attack, however, the municipal defendants did not, as far as the record shows, propound a single interrogatory or request for admission. They did not depose any of the plaintiff's witnesses who might have been in possession of significant, probative evidence. In short, they made no effort to discover the evidentiary basis for the plaintiffs' case. Now both municipal defendants have moved for summary judgment solely on the ground that the plaintiffs have no evidence:

Clearly, Salt Lake County supervised its employees .... Plaintiffs have no evidence that this procedure was not followed .... There is no evidence of any such failure [to train in the use of confidential informants] ....

(County's Mem. in Supp. of Summ. J. at 23.) In the instant case, Mr. Haywood cannot meet the requisite evidentiary burden in order to maintain this action against Salt Lake City Corporation .... Dismissal of Mr. Haywood's case is mandated where the plaintiff [does not have] sufficient facts in his possession to adequately support the claims contained therein. In the instant case there exists no evidence that Salt Lake City ... failed to train or supervise its police officers ....

(City's Mem. in Supp. of Summ. J. at 16, 18.) By moving for summary judgment in this fashion, the defendants ask the impossible. They wish for the court to rule on the sufficiency of the plaintiffs' evidence even though there is no place in the record where such information appears. Even if the depositions of the individual defendants, conducted by the plaintiffs, have not provided the plaintiffs with sufficient evidence to go forward (a matter on which the court expresses no opinion at this time), the court certainly cannot rule as a matter of law that the plaintiffs lack other probative evidence which would allow them to prevail at trial.

The law is clear that defendants may not assert the absence of evidence in the plaintiffs' case without having made some effort to inquire what evidence the plaintiffs have in their possession:

[C]onclusory assertions to aver the absence of evidence remain insufficient to meet this burden. Otherwise, as Justice Brennan cautioned, summary judgment '[would] be converted into a tool for harassment.'

*Windon Third Oil and Gas v. FDIC,* 805 F.2d 342, 345 n. 7 (10th Cir.1986) (quoting

*Celotex,* 477 U.S. at 332 (Brennan, J., dissenting)).[7] Yet the defendants in this case have made *only* a "conclusory assertion" that the plaintiffs have no evidence. The municipal defendants' motions are therefore denied. *Celotex,* 477 U.S. at 332 (Brennan, J., dissenting) ("If the moving party has not fully discharged this initial burden of production, its motion for summary judgment must be denied ....").

### Order

For the reasons stated above, the defendants' motions for summary judgment on the § 1985 racial conspiracy claim and the § 1983 equal protection claim are GRANTED. The defendants' motions for summary judgment on the Fourth Amendment claims, the malicious prosecution claims, and the municipal liability claims are DENIED.

---

**7.** *See also Celotex,* 477 U.S. at 328 (White, J., concurring) ("It is not enough to move for summary judgment ... with a conclusory assertion that the plaintiff has no evidence to prove his case."); *id.* at 332 (Brennan, J., dissenting) ("Plainly, a conclusory assertion that the nonmoving party has no evidence is insufficient."); *Ashe v. Corley,* 992 F.2d 540, 543 (5th Cir.1993) (" '[S]imply filing a summary judgment motion does not immediately compel the party opposing the motion to come forward with evidence demonstrating material issues of fact as to every element of its case.' It is not enough for the moving party to merely make a conclusory statement that the other party has no evidence to prove his case.").