**Dale M. GIBBONS, Plaintiff,**

v.

**Doug LAMBERT, et al., Defendants.**

**No. 2:02 CV 01244 PGC.**

United States District Court,
D. Utah,
Central Division.

Jan. 31, 2005.

Darwin L. Overson, Clayton A. Simms, Overson & Sims LLC, Jeffrey Robinson, Robinson & Sheen LLC, Mark A. Flores, Salt Lake City, UT, for Dale M. Gibbons, Plaintiff.

Michael P. O'Brien, Jones Waldo Holbrook & McDonough, Salt Lake City, UT, for Salt Lake Tribune, Stephen Hunt, Movants.

Dennis C. Ferguson, Williams & Hunt, T. J. Tsakalos, Donald H. Hansen, Salt Lake County Attorneys Office, John P. Soltis, County Office of Legal Counsel, Salt Lake City, Utah, for Doug Lambert, Individually and in his capacity as a Salt Lake County Sheriff's Deputy, Defendant.

Donald H. Hansen, Salt Lake County Attorney's Office, Salt Lake City, for Serena Wissler, Individually and in her capacity as a Deputy Salt Lake District Attorney, Kent Morgan, Individually and in his capacity as a Deputy Salt Lake District Attorney, Defendant.

John P. Soltis, County Office of Legal Counsel, Salt Lake City, UT, for David Yocom, Individually and in his capacity as the Salt Lake County District Attorney, Aaron Kennard, Individually and in his capacity as the Salt Lake County Sheriff, Defendant.

Dennis C. Ferguson, Williams & Hunt, Salt Lake City, UT, T. J. Tsakalos, for Darren Carr, Individually and in his capacity as a Salt Lake County Sheriff's Deputy, Brett Stewart, Individually and in his capacity as a Salt Lake County Sheriff's Deputy, defendant.

Dennis C. Ferguson, Williams & Hunt, T. J. Tsakalos, Donald H. Hansen, Salt Lake County Attorneys Office, John P. Soltis, County Office of Legal Counsel, Salt Lake City, UT, for Jason A. Mazuran, Individually and in his capacity as a Salt Lake County Sheriffs Deputy, defendant.

Joni J. Jones, Utah Attorney General's Office Litigation Unit, Salt Lake City, UT, for Club Drug Workshop, A public board commissioned by the State of Utah, Utah Commission on Criminal and Juvenile Justice, A public commission commissioned by the State of Utah, Edward McConkie, In his capacity as Executive Director of the Utah Commission on Criminal Juvenille Justice, Utah Substance Abuse & Anti-

Violence Coordinating Council, A public board commissioned by the State of Utah, Susan Burke, In her capacity as the Director of the Utah capacity as the chair of the Club Drug Workgroup, Michael Leavitt, In his capacity as Governor of the State of Utah, Defendant.

John P. Soltis, County Office of Legal Counsel, Salt Lake City, for Salt Lake County, A Municipality, defendant.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

CASSELL, District Judge.

This civil rights action arises out of a failed prosecution of plaintiff Dale M. Gibbons. On June 21, 2001, with a signed search warrant in hand, members of the Salt Lake County Sheriff's Office executed a search of Gibbons' home. After they found methamphetamine, Gibbons was arrested and charged with child endangerment, possession of a controlled substance, and dealing in harmful material to a minor. At the time of his arrest, Gibbons was the Chief Financial Officer ("CFO") of a large and well-known Utah bank.

Soon after his arrest, Gibbons resigned from his position with the bank. While the child endangerment count was dismissed before trial, Gibbons was prosecuted on the other two counts. After a full trial in June 2002, Gibbons was acquitted of both charges. Just before his acquittal, Gibbons filed this federal lawsuit alleging 25 federal and state causes of actions. He has claimed damages in the amount of $80 million, stemming largely from the loss of his CFO position. Because Gibbons failed to strictly comply with the requirements of Utah's Governmental Immunity Act, the court previously dismissed all state claims in an earlier ruling. Moreover, Gibbons has voluntarily withdrawn the following claims: (1) violation of his *Miranda* rights,

(2) taunting or derogatory statements, (3) familial relations claim, (4) "knock and announce" violation, and (5) property damage claims.

After a thorough review of the pleadings, the court finds that summary judgment in favor of the defendants is appropriate on almost all of Gibbons' remaining claims. As to one claim—the claim that drugs were planted in Gibbons' home—there remains a genuine issue of material fact that prevents the court from granting summary judgment. Therefore, defendants' motion for summary judgment on all remaining federal claims is hereby GRANTED IN PART and DENIED IN PART. Furthermore, because of the complexity of the damages issue present in this case, the court hereby orders that all issues relating to damages be bifurcated from proceedings in which liability will be determined, as allowed under Federal Rule of Civil Procedure 42(b). If necessary, damages will be addressed in separate, subsequent proceedings.

## BACKGROUND

This civil rights action arises out of the execution of a search warrant at Gibbons home located in Holladay, Utah. The named defendants are officers of the Salt Lake County Sheriff's Office (Sheriff Aaron Kennard, Sergeant Darren Carr, Officer Doug Lambert, Officer Jason Mazuran, and Deputy Brett Stewart), attorneys in the Salt Lake County prosecutor's office (District Attorney David Yocom, Deputy District Attorney Kent Morgan, and District Attorney Serena Wissler), Salt Lake County itself, and John Does 1–40. Gibbons argues that all named defendants were significantly involved in events leading up to and following the search of Gibbons' home, including Gibbons' arrest. On the defendants' motion for summary judgment, the court takes all facts in the light

most favorable to Gibbons. Viewed in that light, the court finds the following facts are sufficiently supported.

## THE INVESTIGATION

### Alarm Drop

On October 8, 2000, Salt Lake County Sheriff Deputy Bret Stewart and his partner responded to an "alarm drop" call at Gibbons' home. An "alarm drop" call is in response to a burglar alarm; the security company notifies law enforcement dispatch when the security system has been tripped. Deputy Stewart had never been to Gibbons' home on any previous occasion and had never before investigated Gibbons or his residence before that date. Upon arriving at Gibbons' home, the deputies were met by Veronica Gibbons—Mr. Gibbons' wife, although they were separated at the time—who told the deputies that four intruders were inside. While looking for the individuals, Deputy Stewart found in plain view drug paraphernalia: a ceramic or glass pipe, a spoon with residue, a lighter, a hanger, baking powder, and numerous nitrous oxide cartridges. Officer Lambert later testified that he performed a field test, which resulted in the pipe testing positive for cocaine.

Deputy Stewart requested that an identification technician come to the home. The technician subsequently arrived and photographed each of the items the deputies identified. At that point, Deputy Stewart collected what he believed to be pertinent evidence and booked it into evidence. Then, after interviewing four of the five individuals who had been in the home—one individual had fled before the deputies' arrival—he learned that one of the four had an outstanding arrest warrant. That individual was arrested. After the arrest, Deputy Stewart spoke to Veronica Gibbons, who told him that she was not the homeowner, but that the home was owned by Mr. Gibbons.

Deputy Stewart did not do any further significant investigation of the Alarm Drop (aside from booking the arrested individual into jail and booking the evidence into police custody). Additionally, Deputy Stewart also tried calling Mr. Gibbons by using a cell phone number Veronica Gibbons gave him. Deputy Stewart left a message for Mr. Gibbons regarding the incident, but he never responded. It was not until July 13, 2001, that Deputy Stewart revisited the case. On that day, Deputy Stewart received a notice asking him to determine whether the case was going to proceed with criminal charges or if it could be closed. If a case is ready to be closed, the notice instructs the officer to destroy any property seized in connection to the newly closed case. According to Deputy Stewart's testimony, he examined the facts of the case and, as the assigned officer of the case, knew that he would not be pursuing any criminal charges regarding the paraphernalia seized. He therefore concluded that there was no further need to retain the glass pipe, the spoon, and other seized evidence. Despite knowing of Gibbons arrest on the later incident in June (discussed below), Deputy Stewart authorized the destruction of the evidence from the Alarm Drop. This authorization was given despite the fact that Gibbons' defense counsel on the later incident had about a week earlier, on July 5, 2001, served the prosecution with discovery requesting the pipe and spoon. The evidence was destroyed sometime shortly after Deputy Stewart gave the authorization.

### Trash Covers

On October 28, 2000, Officer Lambert directed a "trash cover" to be performed at Gibbons' home. A trash cover refers to a method of investigation in which law enforcement personnel empty an individual's garbage can when it is placed on the street (before being emptied by a disposal

service). After emptying the can's contents, law enforcement personnel identifies and seizes any items that are helpful in any ongoing investigation. From that single trash cover, a number of seemingly incriminating items were found, including:

— Empty boxes of nitrous oxide chargers (5)
— Empty cartridges bearing nitrous oxide labels (79)
— A large empty balloon
— A pornographic magazine entitled "Teen Sex"
— Empty plastic tubes for snorting (4)
— A razor blade with burned edges
— An empty $1'' \times 1''$ plastic baggie with a crystalline residue
— A crushed beer can fashioned into a smoking device
— Invitations to rave parties (2)
— A rave Trance–Mission ticket with a closed bobby pin attached
— A brown bottle containing a white crystalline residue around the top, bearing the label reading "Ketamina Chemnova."

Officer Lambert performed field tests on the beer can and brown bottle, testing only for opiates, cocaine, and methamphetamine. The tests were negative. Another trash cover was conducted approximately a week later. Nothing significant was found.

*Informant Information*

Officer Lambert asserts that he received information from three informants that helped him build a case against Gibbons before the search of his home. Specifically, Officer Lambert states that Rian Wilson, Ryan Morgan, and one confidential informant admitted that Gibbons had hosted rave parties and supplied illegal substances to his guests, several of which were minors. In describing a conversation between Ryan Morgan and Officer Lambert at which Officer Mazuran was present, Officer Mazuran stated:

> [T]he things that I do remember about that conversation was [Ryan] Morgan talking about Dale Gibbons, talking about his parties, talking about the amount of drugs that he provided at his parties and the amount of drugs he had access to, some of the other things that went on at his parties.

Rian Wilson and Ryan Morgan have since disavowed providing any such information to Officer Lambert. In an effort to corroborate the information they claim to have received from informants, defendants have submitted to the court nearly a half-dozen transcripts from depositions given by those that had attended many of Gibbons' parties, Gibbons' housekeeper, and Gibbons' driver. These depositions all report that Gibbons was a heavy drug user and openly consumed drugs during his many parties. Many of the depositions provide details regarding where Gibbons would keep drugs—some specifically referred to the night stand where police later found a baggie of methamphetamine—and the methods by which he would prepare and consume the different drugs. Furthermore, the depositions also give accounts of Gibbons giving drugs to his 15–year old daughter, as well as taking her to different night clubs where he provided her large amounts of alcohol. The court, however, must only look to what defendants knew at the time of the search. Therefore, in reaching its decision, the court has in no way considered the numerous statements alleging—with even more specificity than the informants—Gibbons' drug use, the specific location of the drugs in his house, his on-going drug use with his daughter at both home and in public, and his distribution of a variety of drugs (including cocaine, methamphetamine, and ketamine) to dozens of his guests, several of whom were minors.

*Emergency 9–1–1 Call*

On June 11, 2001, at approximately 4 a.m., Gibbons made an emergency call to 9–1–1. In that call, Gibbons requested an ambulance be sent to assist his 19–year old girlfriend. According to what Gibbons told the emergency dispatcher, Cynthia Snowden was unconscious and had perhaps attempted suicide. Gibbons also informed the dispatcher that she may have been raped four hours earlier.

Responding medical personnel arrived at Gibbons' home and found Snowden laying completely nude on Gibbons' bed in an unresponsive and comatose state. While attending to Snowden, emergency personnel became aware of another young woman: Gibbons' fifteen-year old daughter ("R.G."), who like Snowden was found lying in her bed in an unresponsive and comatose state. Some of those who responded to the 9–1–1 call, in addition to an emergency room nurse, told law enforcement that they suspected both young women to be suffering from a GHB overdose. GHB, an acronym for the chemical gamma hydroxy butyrate, is a "club drug" often used to incapacitate individuals for the commission of sexual assault and rape; it is considered a controlled substance under Utah law.[1] Both young women were rushed by ambulance to the hospital. At the time Officer Lambert applied for the search warrant, he was unaware of what substances either young woman had actually taken.

In an effort to determine whether there were more individuals in need of medical attention, law enforcement and emergency personnel performed a "protective sweep" of the house. No other individuals were found. During the sweep, however, hardcore pornographic materials (namely videos, dvds, and magazines) were found in closets, gathering spaces, and bedrooms. Other items noticed by emergency personnel throughout the house included, among other things, a camera tripod standing near the foot of the bed where Snowden was found lying nude and unconscious, handcuffs in that same bedroom, chains with straps and buckles, black leather straps with chrome buckles, and a stockade large enough to detain an average-sized adult.

While both young women were being attended to, Gibbons looked on and did not volunteer any information regarding their condition, nor did he bother informing anyone that his 15–year old daughter was also unconscious in another room. As described to Officer Lambert by Officer Goldberg, law enforcement officers found Gibbons in his house in an intoxicated state. Gibbons' speech was slurred, he was uncooperative and unwilling to provide any helpful information regarding Snowden and R.G.. Officer Lambert was further informed by Officer Goldberg that there were many items of a sexual nature in plain view. Officer Golberg also discovered an unused syringe in the bathroom. As described by ambulance personnel Rosalie Kiddle, whose report was used by Officer Lambert in obtaining the search warrant, Gibbons was "acting funny" and "didn't seem too concerned that there were cops, firemen and EMTs in his home at four a.m. in the morning, and he didn't seem concerned about the state of the two girls."[2] "The scene seemed odd because of the way [Gibbons] was acting and the condition of both of the parties."[3]

## THE SEARCH WARRANT AND SUPPORTING AFFIDAVIT

On June 18, 2001, Officer Lambert, with help from Deputy District Attorney Wis-

---

1. Utah Code Ann. § 58–37–4(2)(a)(vii).

2. Depo. Rosalie Kiddle, at 29–32.

3. *Id.*

sler, prepared an affidavit for a search warrant detailing the investigative activities. While Sergeant Carr and Officer Mazuran did not participate in the physical preparation of the supporting affidavit, Officer Lambert consulted both officers regarding whether there was sufficient probable cause to justify a search warrant.[4] Regarding whether Officer Lambert sought either Sergeant Carr's or Officer Mazuran's advice on whether probable cause existed, Lambert testified in his deposition:

> Not necessarily their advice, but more over to make sure as a unit, we have the necessary requirements to establish the facts of the probable cause. Kind of a check and balance to make sure that everybody is comfortable with the investigation.[5]

The affidavit requested an approach under the cover of darkness in the night time hours to afford the best possibility for officer safety based on belief that the suspect used counter-surveillance measures to avoid detection. Further support for Officer Lambert's request for a search under the cover of darkness was the fact that Gibbons' home was in a residential neighborhood where children were often seen walking during the daytime.

As grounds for the search warrant, Officer Lambert provided facts detailing incidents involving Gibbons. More specifically, Officer Lambert outlined three primary events: (1) the October 10, 2000, Alarm Drop; (2) the trash cover conducted under the direction of Officer Lambert on October 24, 2000; and (3) and the June 11, 2001 9–1–1 Call made by Gibbons. In addition to those three events, the affidavit provided further information from police call logs (the "Call Logs") and from three informants, Ryan Wilson, Rian Morgan, and one confidential informant. The affidavit recounted:

> Your affiant has received several complaints from several unrelated sources that [Gibbons' home] has been and continues to be a place for the ongoing use of controlled substances. An informant, Ryan Wilson, took me to this address and named Dale Gibbons as having been the host of several drug parties which included the use and distribution of controlled substances to adults and minors alike[,] [i]ncluding but not limited to GHB, Ketamine, and Ecstacy.

> All complaints received by your affiant were similar in nature and named Dale Gibbons as a habitual drug user. All reports described the use of Ketamine, GHB, and Ecstasy on a frequent basis at the residence and were commonly used as Sexual Enhancers by Dale Gibbons and guests of his home. It was also reported to your affiant that there has been situations amounting to possible sexual assaults on many young females, which have never been reported to Police.

In describing the 9–1–1 Call, Officer Lambert stated that "[i]t was suspected that [Snowden] was suffering a GHB overdose." The affidavit also described R.G. as having "suffer[ed] an apparent GHB overdose." Officer Lambert cited an emergency room nurse, Gene Miner, as the source of the GHB suspicion. Along with the description of the two young women found comatose in Gibbons' home that night, the affidavit also referred to the pornographic material observed in the home:

> As Deputies checked the house for additional victims they noticed a great deal of [p]ornographic material around the

---

4. Depo. Doug Lambert, at 22:14–22; 24:13–25:2.

5. *Id.*

house within immediate access to the 15 y[ea]r old daughter. Pursuant to the Deputies continuing the protective sweep of the residence deputies observed a room that appeared to be dedicated to sexual activities. ... In the center of the room was a stockade large enough to fit an adult human being. In addition the room contained numerous items of pornography.

The affidavit contained further descriptions of the Emergency 9–1–1 Call: "Deputy John Wester conducted several interviews of the responding medical personnel who described the scene as 'Strange and Suspicious[,]' [s]ince the Complainant/Suspect was telling them that Cynthia Snowden had been raped four hours earlier, yet she was naked in his bed, unconscious and unresponsive." The affidavit continued:

Salt Lake County Fire Personnel noticed that there was a video camera on a tri-pod stand facing the bed. Responding personnel also noticed drug paraphernalia (syringes) scattered around the room, as well as sexual related toys.... These observations added to the medical personnel's suspicion of Dale Gibbons and the story he was giving.

The affidavit was presented to and signed by Utah state court Judge Judith Atherton.

### SEARCH AND ARREST

In the early morning of June 18, 2001, after conducting a preparatory meeting, Officer Lambert led a dozen or so law enforcement officers to Gibbons' home. All were dressed in plain clothes, with the exception of tactical vests. After climbing over the gate surrounding Gibbons' property, the officers approached Gibbons' door and knocked. While Gibbons denies ever hearing a knock, the testimony of every officer there suggests that Sergeant Carr knocked, waited 15–20 seconds for a re-

sponse, and knocked again. Again receiving no response, Carr gave approval to forcefully enter Gibbons' home. Gibbons has testified that he and Snowden were in bed at the time he heard the sheriffs enter.

Upon entering the home, the officers quickly found a naked Gibbons, announced themselves as police—officer testimony asserts that they announced themselves immediately upon opening the front door— and ordered him to lie on the ground. Officer Lambert and Officer Evan Mallas stood over Gibbons with their guns. Officer Lambert was using an assault rifle, and had it pointed directly at Gibbons. Gibbons claims that the gun's nozzle was pressed to his back, but states that "[i]t wasn't pressed in hard, really, but it was, you know, some pressure."[6] Gibbons remembers the gun being held to his back for "several seconds." Within a minute of being ordered to the ground, Gibbons was handcuffed, helped to his feet, and allowed to get dressed. Snowden was thereafter found in the master bedroom. She was directed to get out of the bed and then was taken to get dressed. Once both were dressed, they were escorted downstairs where officers attempted to interview them.

While searching the master bedroom where Gibbons and Snowden were found, Officer Mazuran soon found a baggie of suspected methamphetamine. According to his deposition testimony, Officer Mazuran opened a dresser drawer, saw the baggie, and then requested someone to photograph it. Once the drawer's contents were photographed, the baggie was seized and documented. This fact is disputed by Gibbons, who claims that the baggie was planted by law enforcement. Gibbons concedes that he saw nothing or knows nothing regarding any specific involved with evidence tampering or planting, as this excerpt from his deposition makes clear:

---

6. Dale Gibbons Depo. V.II, at 885.

Q: Did you ever see anybody place the baggie in the night stand in the bedroom?

A: No.

Q: Do you know of any witness who will testify that they saw a police officer place the baggies in the night stand?

[Discussion with Counsel]

Q: You don't know of any witness that will so testify?

A: No.

Q: I guess that's do you know of a witness that will testify that they saw a police officer place the baggies in the night stand?

A: No.

Gibbons, however, has presented to the court photographs of the drawer in question that fail to show the methamphetamine. At approximately 6:37 a.m., a video technician recorded images of the night stand. No baggie can be see on the video. About fifty minutes *later,* at approximately 7:29 a.m., Officer Lambert took a digital photograph in which the baggie can be clearly seen laying on top of several items in the same night stand drawer.

After seizing the baggie, law enforcement personnel confiscated several other items in the home that they believed were significant in a potential case against Gibbons. In his deposition, Gibbons admits to there being sexually oriented materials in his bedroom:

Q: Tell me what kind of items [Snowden] kept [in the master bedroom]?

A: ... [S]he had a dildo thing. A vibrator. Stuff like that. We had bought some videos together.

Q: How many of those items were there in the master bedroom?

A: Probably, I don't know, four or five.

Aside from the sexual toys mentioned by Gibbons, other seized items found throughout the home were pornographic materials (magazines, videos, and dvds), a leather whip, three pairs of handcuffs, a vibrator, nitrous oxide cartridges, rave party paraphernalia, syringes, and six bottles of an unknown liquid. Law enforcement also found business cards listing Gibbons' employment. It was at this point that they became aware that Gibbons was the CFO of a large and well-known Utah bank. There is no evidence that anyone involved with the investigation knew of Gibbons' employment before this time.

## THE MEDIA

After the home was secured, Sergeant Carr called a member of the media and informed him that a search warrant had just been executed in Holladay—the Utah city where Gibbons' home is located. Gibbons testified that before being escorted outside and into a police vehicle, he heard someone say that "they" (the officers escorting Gibbons to jail) needed to wait a few more minutes for "them" to set up. According to Gibbons, he was escorted by a single deputy from his garage to a truck located in his driveway approximately 30 feet from his garage. During his walk to the truck, Gibbons noticed a camera crew filming outside the gates of his home. Gibbons testified that he never saw a single member of the media on his property, but did see some standing off his property, approximately 40 feet from the truck. Aside from the officer taking a moment— five seconds—to rearrange something in his truck, Gibbons was immediately placed in the truck and taken to the county jail. In all, Gibbons stated that it took just "a minute" to take him from his house and place him inside the deputy's truck.

At the scene, Sergeant Carr was interviewed and answered questions from a local television station about the arrest. Immediately following Gibbons' arrest, Peggy Faulkner, then the public information officer for the Sheriff's Office, received calls

from the media regarding the Gibbons investigation. Faulkner immediately called Sergeant Carr and asked if he would respond to the calls. Kent Morgan, a county prosecutor, informed the Sheriff's Office on the night of the arrest that all media contacts were to be authorized by him. Despite this advice, the Sheriff's Office chose to hold its own press conference on the day following the arrest. Due to the public's strong interest in the investigation (it was soon reported by the media that Gibbons was the CFO of a large Utah bank), on the day following the arrest, Sergeant Carr held a press conference during which he encouraged anyone who had information regarding any illegal activity associated with Gibbons, or anyone who felt that they were perhaps sexually assaulted during one of Gibbons' parties, to contact the Sheriff's Office.

Gibbons was subsequently charged with three crimes—child endangerment, possession of a controlled substance, and dealing in harmful material to a minor. While the child endangerment count was dismissed before trial, Gibbons was prosecuted for the other two counts. In June 2002, following a full trial, Gibbons was acquitted on both charges. Just before the acquittal, Gibbons filed this federal case alleging 25 federal and state causes of actions.

## SUMMARY JUDGMENT STANDARD

In considering defendants' summary judgment motion, if "there is not a genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."[7] The evidence must be viewed in the light most favorable to the non-movant, but he must present sufficient admissible evidence to demonstrate that there remains a genuine issue of material fact in dispute.[8]

Under rule 56(c), the moving party has the initial burden to show that "there is an absence of evidence to support the non-moving party's case."[9] Upon making such a showing, the burden shifts from the moving party to the nonmoving party, who must then "make a showing sufficient to establish that there is a genuine issue of material fact regarding 'the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"[10] "When, as in this case, the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden by pointing to a 'lack of evidence for the nonmovant on an essential element of the nonmovant's claim.'"[11]

Gibbons may not rest upon "the mere allegations or denials of [his] pleading . . . ."[12] To avoid summary judgment, Gibbons must go beyond the pleadings and establish that there is a genuine issue of material fact that must be resolved by the trier of fact.[13] In so doing, he must designate "*specific* facts showing that there is a genuine issue for trial"[14] and "must present affirmative evidence in order to defeat a properly supported summary judgment

7. Fed.R.Civ.P. 56(c).

8. *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1536–37 (10th Cir.1995) (citing *Conaway v. Smith*, 853 F.2d 789, 792 n. 4 (10th Cir. 1988)).

9. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

10. *Gross*, 53 F.3d at 1537 (quoting *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548)

11. *Sports Unlimited, Inc. v. Lankford Enterprises, Inc.*, 275 F.3d 996, 999 (10th Cir.2002) (quoting *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir.1998)).

12. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

13. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548.

14. *Id.* (emphasis added).

motion."[15] "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."[16] Summary judgment is proper when the trial judge can conclude that no *reasonable* trier of fact could find for the nonmovant on the basis of evidence presented in the motion and the response.[17]

## CLAIMS AGAINST SALT LAKE COUNTY, SALT LAKE COUNTY SHERIFF AARON KENNARD, SALT LAKE COUNTY DISTRICT ATTORNEY DAVID YOCOM, AND SALT LAKE COUNTY DEPUTY DISTRICT ATTORNEY KENT MORGAN

The many claims Gibbons has filed in this case include several "failure to supervise" claims against Salt Lake County, Salt Lake County Sheriff Aaron Kennard, Salt Lake County District Attorney David Yocom, and Salt Lake County Deputy District Attorney Kent Morgan. The following claims are grounded in his assertion that these defendants failed to properly supervise certain subordinates: conspiracy, violation of Gibbons' Fourth Amendment rights, and a substantive due process claim for failure to return his property. Gibbons, however, has failed to provide any meaningful evidence demonstrating that any of the defendants were significantly involved in any of the incidences

that underlie his claims. Title 42 U.S.C. § 1983 provides in relevant part:

> Every *person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.[18]

While the statute allows a plaintiff to assert a claim against these defendants, Gibbons' lack of evidence forces the court to dismiss all claims against the County and these defendants.

### Salt Lake County

■ Although "municipalities and other local government bodies are 'persons' within the meaning of § 1983,"[19] "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor."[20] The legal doctrine of *respondeat superior* has no place in suits against a municipality.[21]

> Instead ... we have required a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal "policy" or "custom" that caused the plaintiff's injury. Locating a "policy" ensures that a municipality is held liable only for those deprivations resulting

---

15. *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505.

16. *Id.* at 252, 106 S.Ct. 2505.

17. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

18. (Emphasis added).

19. *Board of County Comm'rs of Bryan County, Okl. v. Brown,* 520 U.S. 397, 402–03, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (citing

*Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 689, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)).

20. *Id.* at 403, 117 S.Ct. 1382.

21. *Id.* ("We have consistently refused to hold municipalities liable under a theory of *respondeat superior.*") (citing *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 818, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (plurality opinion); *City of Canton, Ohio v. Harris,* 489 U.S. 378, 392, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)).

from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality. [22]

Gibbons has failed to present any evidence that any of the questionable actions he alleges were done in accord with County policy or custom. Rather, Gibbons points only to Salt Lake County's alleged failure to enforce a policy regarding media-related actions, failure to have policies detailing the proper destruction of evidence, and for its failure to properly train certain deputies and prosecutors. Looking at this limited evidence, Gibbons falls well short of demonstrating "that through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged. That is, [Gibbons] must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." [23]

Because Gibbons is also "seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate [his] rights" [24]— Gibbons asserts that he was harmed because of the sheriff department's failure to adequately train its deputies—Gibbons "must [also] demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." [25] In contrast to some other cases, there is no evidence here that the municipality was aware of, and acquiesced

in, a pattern of constitutional violations. [26] Without such evidence, and for other reasons already stated, Gibbons' claims against Salt Lake County cannot survive defendants' summary judgment motion.

### Sheriff Aaron Kennard and District Attorney David Yocom

 There is no evidence that Sheriff Kennard or District Attorney Yocom were personally involved in any constitutional violations Gibbons alleges. In a § 1983 claim, a supervisor is not liable "unless an 'affirmative link' exists between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise." [27] Gibbons has merely presented conclusory allegations as proof that either Sheriff Kennard or District Attorney Yocom participated or acquiesced in the constitutional deprivations of which the complaint is made. [28] Further, while there may be room for improvement in the way in which Officer Lambert and some others conducted themselves during the investigation, much more is required to hold the supervisors in this matter liable. "A supervisor or municipality may be held liable where there is essentially a *complete* failure to train, or training that is so reckless or grossly negligent that future misconduct was almost inevitable." [29]

There is no evidence that either Sheriff Kennard or District Attorney Yocom knew of the misrepresentations or omissions alleged by Gibbons. There is no evidence

---

**22.** *Id.* at 403–04, 117 S.Ct. 1382.

**23.** *Id.* at 404, 109 S.Ct. 1197 (emphasis in original).

**24.** *Id.* at 407, 109 S.Ct. 1197.

**25.** *Id.*

**26.** *See Canton,* 489 U.S. at 397, 109 S.Ct. 1197 (O'Connor, J., concurring in part and dissenting in part).

**27.** *Meade v. Grubbs,* 841 F.2d 1512, 1527 (10th Cir.1988) (citations omitted).

**28.** *See Kite v. Kelley,* 546 F.2d 334, 337 (10th Cir.1976).

**29.** *Meade,* 841 F.2d at 1528.

that either Sheriff Kennard or District Attorney Yocom knew of the possibility that certain defendants had planted evidence in Gibbons' home. There is nothing more than mere allegations as to Gibbons' claim that Sheriff Kennard and District Attorney Yocom knew of or participated in a conspiracy against Gibbons. And finally, there is no evidence that any failure to enforce media policies or any other policy was the proximate cause of any of Gibbons' injuries. Based on the lack of evidence presented by Gibbons as to any affirmative link between Sheriff Kennard and District Attorney Yocom, all claims against both these defendants are dismissed.

### Deputy District Attorney Kent Morgan

As with the claims against Sheriff Kennard and District Attorney Yocom, Gibbons has failed to carry his burden of providing evidence to show that Deputy District Attorney Morgan, as Deputy District Attorney Wissler's supervisor, failed to train or supervise her or so recklessly trained or supervised her that future constitutional violations were inevitable. Because Gibbons has not met this burden, his claims against Deputy District Attorney Morgan are dismissed. Gibbons' claim against Deputy District Attorney Morgan for defamatory statements to the press is also dismissed, for reasons discussed below.

### PROBABLE CAUSE—GIBBONS' FOURTH AMENDMENT CLAIMS

■ Gibbons' § 1983 claim is centered upon his allegation that the search on his

home was executed without probable cause, an allegation that, if true, would constitute a violation of the Fourth Amendment. A search warrant must be supported by probable cause—"more than mere suspicion but less evidence than is necessary to convict." [30] "An affidavit in support of a search warrant must contain facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity." [31] When reviewing a judge's finding of probable cause for the issuance of a search warrant, the court "must consider the totality of the circumstances and determine whether the affidavit established the probability that evidence of criminal activity would be located in the desired search area." [32] Great deference is given to a magistrate's determination that probable cause existed; [33] the court asks only "whether the issuing magistrate had a 'substantial basis' for determining probable cause existed." [34] Because Gibbons argues that the affidavit contained numerous misrepresentations and omissions, the court must address whether those disputed portions are grounds for denying defendants' summary judgment motion.

"It is a violation of the Fourth Amendment for an affiant to knowingly and intentionally, or with reckless disregard for the truth, make a false statement in an affidavit. Where a false statement is made in an affidavit for a search warrant, the search warrant must be voided if the affidavit's remaining content is insufficient to

**30.** *United States v. Burns*, 624 F.2d 95, 99 (10th Cir.1980), *cert. denied*, 449 U.S. 954, 101 S.Ct. 361, 66 L.Ed.2d 219 (1980).

**31.** *United States v. Danhauer*, 229 F.3d 1002, 1005–06 (10th Cir.2000)

**32.** *United States v. Wittgenstein*, 163 F.3d 1164, 1171 (10th Cir.1998), *cert. denied*, 527

U.S. 1012, 119 S.Ct. 2355, 144 L.Ed.2d 250 (1999).

**33.** *Wittgenstein*, 163 F.3d at 1172.

**34.** *Id.* (quoting *Lawmaster v. Ward*, 125 F.3d 1341, 1348 (10th Cir.1997)).

establish probable cause." [35] Similarly, "[i]n a case where the [plaintiff] alleges information was intentionally omitted from an affidavit, the existence of probable cause is determined by examining the affidavit as if the omitted information had been included and determining whether the affidavit would still give rise to probable cause." [36]

Even assuming all the statements Gibbons argues are false or misrepresented were found to be so, none were critical to the probable cause determination. Gibbons asserts, among other things, that Lambert, and others, inserted false statements from informants, misrepresented the alarm drop to be an arrest warrant call, and omitted facts regarding the likelihood of seized paraphernalia belonging to the "intruders" found by Stewart during a response to an alarm call. Assuming these allegations are true, "the next step in the analysis requires that the court examine the affidavit to determine whether inclusion of that information would have vitiated probable cause." [37] Unlike this court's decision in *Haywood* where the false information "was the *sole* source of the information in the affidavit, and there was no independent corroboration of the information provided by him," [38] defendants had numerous facts corroborating any information received by informants. Specifically, the items found in the trash cover (e.g., empty boxes of nitrous oxide chargers, empty nitrous oxide cartridges, an empty plastic tubes for snorting, a razor blade with burned edges, an empty 1″ × 1″ plastic baggie with a crystalline residue, a crushed beer can fashioned into a smoking device, and a brown bottle containing a white crystalline residue around the top, bearing the label reading "Ketamina Chemnova") and the statements by medical and law enforcement personnel who responded to the 9–1–1 call on June 11, 2001 (e.g., two women found unresponsive, pornographic material, and bondage instruments) were sufficient to provide independent sources of probable cause. The question then becomes whether if all the information known to Lambert—the information Gibbons alleges was misrepresented or omitted—had been disclosed to the judge, would she nonetheless have found probable cause.

Gibbons argues probable cause would not have existed, arguing primarily that the information provided by "several" informants that was included in the affidavit was false and insufficient to establish probable cause. Regarding such a claim, the Tenth Circuit has held that "[w]hen there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant." [39] In support of his argument, Gibbons relies heavily on the Tenth Circuit's decision in *United States v. Danhauer*.[40] In *Danhauer*, a confidential informant reported to the police that Danhauer was cooking methamphetamine in his garage.[41] In addition to statements from the confidential informant, the search warrant affidavit also included information regarding Danhauer's past criminal history.[42] The court found that the affidavit failed to al-

**35.** *U.S. v. Basham,* 268 F.3d 1199, 1204 (emphasis added), *cert. denied,* 535 U.S. 945, 122 S.Ct. 1336, 152 L.Ed.2d 241 (2002).

**36.** *Id.* (citing *Wolford v. Lasater,* 78 F.3d 484, 489 (10th Cir.1996)).

**37.** *Haywood v. Nye,* 999 F.Supp. 1451, 1458–59 (D.Utah 1998).

**38.** *Id.* at 1459.

**39.** *See United States v. Sturmoski,* 971 F.2d 452, 457 (10th Cir.1992).

**40.** 229 F.3d 1002 (10th Cir.2000).

**41.** *Id.* at 1004.

**42.** *Id.*

lege facts sufficient to establish probable cause. In reaching its decision, the court reasoned that the affiant

> [N]either established the veracity of the informant, nor obtained sufficient independent corroboration of the informant's information. The only police corroboration of the informant's information was the affiant's verification of the Danhauer residence's physical description, a records check to confirm that the Danhauers resided at the premises in question, observation of [Danhauer] coming and going from the house to the garage, and a search of the Danhauers' criminal histories .... [43]

Unlike in *Danhauer*, the magistrate judge in this case did not base her decision merely on information from an informant and an officer's quick review of Gibbons' criminal history. The undisputed facts in this case gave the judge enough reason to make a common-sense decision that there was probable cause. First, the affidavit listed numerous items confiscated during a trash cover conducted on October 24, 2000 (79 empty cartridges bearing Nitrous Oxide labels and the like). The Tenth Circuit has found similar evidence seized from trash covers sufficient corroboration to satisfy the probable cause standard.[44] In *United States v. Le*, the court found that information gained from two confidential informants was sufficiently corroborated by evidence seized in a trash cover, namely a "used ziploc baggie with a white powder residue inside of it." [45]

In addition to the trash cover, the other information in the warrant was further corroborated with the strange circumstances surrounding the 9–1–1 call on June

11, 2001. On June 11, 2001, Gibbons called 9–1–1 requesting an ambulance for 19-year old Cynthia Snowden. During the phone call, Gibbons told police that she may have been raped four hours earlier and may have attempted suicide. According to statements by the responding officers, Snowden was found naked and comatose on Gibbons' bed. When asked about what happened, Gibbons failed to provide any helpful information, including that his 15-year old daughter, R.G., was also in a comatose state in another room in the house. Only because responding personnel quickly surveyed the home was R.G. found. She was found lying comatose in a bed, suffering from what medical personnel believed to be a drug-overdose. When asked about RG's situation, Gibbons again was uncooperative.

In looking at the totality of the circumstances, the trash cover and June 11, 2001 emergency call are independent corroborations of any information Lambert, or any other defendant, may have alleged to have received from an informant. In short, if the search warrant affidavit had only contained information regarding the 9–1–1 call and the trash cover, that information alone would have been enough for the judge to find probable cause to search Gibbons' home for evidence of illegal drug use. Moreover, because the illegal drugs could have been secreted anywhere in the home, the officers would have had probable cause to search the entire house.

Aside from the informant information, trash cover, and 9–1–1 call, Gibbons further argues that several misrepresentations were made by Lambert during the process of obtaining a search warrant.

43. *Id.*

44. *See United States v. Le,* 173 F.3d 1258, 1266 (10th Cir.1999) (concluding that affiant's search of suspect's trash and discovery of used bag with white powder residue confirmed to the methamphetamine helped corroborate information received from confidential sources).

45. *Id.*

For example, the affidavit asserts that police were called to Gibbons' residence to effectuate an arrest warrant. In fact, the individual with the outstanding arrest warrant was found incidental to the alarm drop in October 2000. Considering, however, the amount of other evidence articulated in the supporting affidavit, this alleged misrepresentation is of no significant consequence to the finding of probable cause.

Gibbons also argues that because the information included in the affidavit had become stale at the time of the search, any probable cause that may have existed in October 2000 when the trash cover was conducted, had become stale by the June 11, 2001 incident. The court disagrees. To be sure, "Probable cause to search cannot be based on stale information that no longer suggests that the items sought will be found in the place to be searched." [46] At the same time, however, the Tenth Circuit has instructed that "more recent events in an affidavit can refresh otherwise dated information." [47]

Here, police began investigating Gibbons in October 2000. During its investigation, the police performed three trash covers, surveyed the property, and spoke to several informants. Taken alone, it is doubtful that this earlier information would help in establishing probable cause to search Gibbons' residence in June 2001. But that was not the only information available to the judge when the search warrant was issued. First, the affidavit gives numerous details from the 9–1–1 call,

including the fact that two females—one a minor—were found in an overdosed-state. Further, one of the females—a 19–year old woman—was found comatose and nude on Gibbons' bed. Second, the affidavit included statements from emergency and medical personnel, including the emergency room nurse—that the two young women had appeared to have overdosed on either GHB or Ketamine. Other responding medical personnel described the scene as "strange and suspicious." Salt Lake County Fire Personnel noticed that there was camera-tripod facing the bed where the 19–year old woman was found. Third, in performing a protective sweep of the house in an effort to find any other individuals who needed help, the deputies noticed a large amount of pornographic material around the house, most of which was accessible to the Gibbons' 15–year–old daughter. Thus, in making her decision, the judge not only had all the information from October 2000, but also had a detailed account of a suspicious set of circumstances that occurred just days before the request for the search warrant. Taken together, the affidavit's account of the 9–1–1 call on June 11, 2001 "refreshed" the affidavit's earlier facts and further helped establish probable cause for the search.

Nonetheless, even if the court were to find that the previous information obtained from the trash covers and informants had become stale to the point that the 9–1–1 Emergency Call could not refresh that information, the court still finds that the circumstances surrounding the June 11,

---

**46.** *United States v. Snow,* 919 F.2d 1458, 1459 (10th Cir.1990).

**47.** *United States v. Jardine,* 364 F.3d 1200, 1205 (10th Cir.2004) (citing *United States v. Spikes,* 158 F.3d 913, 924 (6th Cir.1998)) ("[E]ven assuming the information in the affidavit was in some respects 'stale,' the more recent events related therein refreshed this otherwise stale information."); *United States*

*v. Greene,* 250 F.3d 471, 481 (6th Cir.2001) (finding twenty-three month old information was refreshed by subsequent corroboration from an informant); *United States v. Bucuvalas,* 970 F.2d 937, 940 (1st Cir.1992) ("Staleness does not undermine the probable cause determination if the affidavit contains information that updates, substantiates, or corroborates the stale material.").

2001 event provided sufficient probable cause to justify the search warrant: one 19–year old found nude and comatose on Gibbons' bed, Gibbons' 15–year old daughter found comatose on her bed, an uncooperative Gibbons, and suspicious items found throughout Gibbons' house, e.g., pornographic materials, bondage instruments, a tripod, and an adult-sized stockade.

## CLAIMS AGAINST SALT LAKE COUNTY DEPUTY DISTRICT ATTORNEY SERENA WISSLER

■ Even if there were no probable cause, Deputy District Attorney Wissler would nevertheless be shielded from liability by the absolute immunity doctrine. "[P]rosecutors are absolutely immune from suit under § 1983 concerning activities 'intimately associated with the judicial ... process,' such as initiating and pursuing criminal prosecutions."[48] In articulating this bright line immunity, the Tenth Circuit reasoned that "[t]he rationale for granting absolute immunity ... is to allow prosecutors ... 'the latitude to perform their [quasi-judicial] tasks absent the threat of retaliatory § 1983 litigation.'"[49] While this immunity is absolute, it only applies to "a prosecutor's actions in connection with the judicial process" and not "those that are primarily investigative or administrative in nature."[50] In making this distinction, "courts have recognized that absolute immunity may attach even to such administrative or investigative activities 'when these functions are necessary so

that a prosecutor may fulfill his function as an officer of the court'"[51]—"[e]ven purely investigative acts are accorded qualified 'good faith' immunity, however."[52]

Gibbons bases his § 1983 claim against Deputy District Attorney Wissler on grounds that she knowingly sought a search warrant without probable cause. According to Gibbons, Wissler helped in the physical preparation of the search warrant and had given Officer Lambert her opinion during the investigation as to whether probable cause existed. In *Kalina v. Fletcher*, the Supreme Court declared that all of the following matters call for a prosecutor's exercise of professional judgment: the determination that the evidence was sufficiently strong to justify a probable-cause finding, the decision to file charges, the presentation of the information to the court, the drafting of the certification, and even the selection of the particular facts to include in the certification to prove the evidentiary support for the finding of probable cause.[53] The U.S. District Court for the District of Kansas applied that decision in *Van Deelen v. City of Eudora, Kan.*[54] There, the prosecutor, upon reading the law enforcement officer's report, made a determination that probable cause for prosecution existed.[55] After that, the same prosecutor drafted the complaint filed against plaintiff and made other independent determination regarding the officer's report.[56] The plaintiff sought to label the prosecutor's actions as investi-

---

**48.** *Pfeiffer v. Hartford Fire Ins. Co.*, 929 F.2d 1484, 1489 (10th Cir.1991).

**49.** *Id.* at 1489–90 (quoting *Snell v. Tunnell*, 920 F.2d 673, 686–87 (10th Cir.1990)).

**50.** *Pfeiffer,* 929 F.2d at 1490.

**51.** *Id.* (quoting *Snell,* 920 F.2d at 693).

**52.** *Id.* at 679 n. 6 (citing *Rex v. Teeples,* 753 F.2d 840, 843 (10th Cir.1985)).

**53.** *See* 522 U.S. 118, 129–31, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997).

**54.** 53 F.Supp.2d 1223 (D.Kan.1999).

**55.** See *id.* at 1228–29.

**56.** *Id.*

gatory and outside the scope of his judicial role because the district attorney admittedly made an independent determination whether probable cause existed.[57] Further evidence used by the plaintiff was the prosecutor's giving of advice to the police chief about the need for additional investigation and with the prosecutor's signing the criminal complaint as the complainant in support of the arrest warrant.[58] In applying the Court's conclusion that "the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom,"[59] the district court held that the prosecutor was "entitled to absolute immunity for his prosecutorial actions in reviewing and evaluating the evidence found in the police offense reports and witness statements, in determining that the evidence was sufficient to support a finding of probable cause, and in deciding to file charges."[60]

Here, Gibbons claims that Deputy District Attorney Wissler waived her absolute immunity by driving past Gibbons' home during the investigation, instructing Officer Lambert to gather information from certain individuals in preparation of applying for a search warrant, and being Officer Lambert's scribe—Wissler typed the warrant's supporting affidavit as Officer Lambert dictated its contents. This evidence, without more, is insufficient to place Deputy District Attorney Wissler in the role of an investigator and outside the role of a prosecutor. Accordingly, Wissler is shielded from liability under absolute immunity for her very limited involvement in drafting the supporting affidavit.

## CONSPIRACY

■ Gibbons also claims that there are sufficient facts from which a jury could reasonably conclude that there was a "general conspiracy"[61] among Sergeant Carr, Officers Lambert and Mazuran, Deputy Stewart, and Deputy District Attorneys Morgan and Wissler. Gibbons asserts that these defendants "perceived an opportunity to jettison [sic] their careers by bringing down a rising star in the local community and the banking industry nationally."[62] While "allegations of conspiracy may, indeed, form the basis of a § 1983 claim,[63] a plaintiff must allege specific facts showing an agreement and concerted action amongst the defendants."[64] "Conclusory allegations of conspiracy are insufficient to state a valid § 1983 claim."[65]

Gibbons has failed to present anything more than conclusory allegations with regard to his accusations that several sheriff deputies, including the Salt Lake County Sheriff, and several county prosecutors, including the Salt Lake District Attorney, conspired against him. Gibbons asserts that he was conspired against because of his social status, high-profiled position at a prestigious Utah bank, and lifestyle. He has admitted, however, that he knows of no one who can testify or who otherwise has personal knowledge of this alleged

**57.** *Id.*

**58.** *Id.*

**59.** *Imbler v. Pachtman*, 424 U.S. 409, 431 n. 33, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)

**60.** *Van Deelen*, 53 F.Supp.2d at 1229.

**61.** Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss, p. 32 (Oct. 26, 2004).

**62.** *Id.*

**63.** *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 533 (10th Cir.1998).

**64.** *Hunt v. Bennett*, 17 F.3d 1263, 1266 (10th Cir.1994), *cert. denied*, 513 U.S. 832, 115 S.Ct. 107, 130 L.Ed.2d 55 (1994).

**65.** *Id.*

conspiracy. Gibbons has no evidence to rebut the countless assertions by the defendants that at the time of his arrest no person involved in the investigation knew Gibbons was a CFO. Moreover, Gibbons has no evidence of any agreement among Officers Lambert, Mazuran, and Carr to conspire against him. Gibbons has no evidence that there was concerted action between *any* sheriff deputy and the county prosecutors. In short, Gibbons has simply failed to carry his burden of providing sufficient evidence to support his claim of conspiracy, and therefore, this claim is dismissed.

## MALICIOUS PROSECUTION

In establishing a claim for malicious prosecution, the Tenth Circuit has found that the common law elements of malicious prosecution are "the starting point for the analysis of a § 1983 malicious prosecution claim." [66] The Circuit further held that the ultimate question that must be reached in a malicious prosecution case is "whether the plaintiff has proven a *constitutional* violation,"—"in the § 1983 malicious prosecution context, that constitutional right is the Fourth Amendment's right to be free from unreasonable [searches and] seizures." [67] In short, the Tenth Circuit recognizes a cause of action under § 1983 for malicious prosecution if the prosecution is conducted in a way that implicates constitutional rights. [68]

■ Under Utah law, lack of probable cause is an essential element of the tort of malicious prosecution. [69] To establish a prima facie case for malicious prosecution, the plaintiff must show that: (1) defen-

dants initiated or procured the prosecution against an innocent plaintiff; (2) defendants did not have probable cause to initiate the prosecution; (3) defendants initiated the prosecution primarily for a purpose other than that of bringing an offender to justice; and (4) the prosecution terminated in favor of the plaintiff. [70]

■ Considering Gibbons was acquitted of the charges filed against him, elements one and four are undisputed. As to the second element—lack of probable cause— there remains a genuine issue of material fact that forces the court to deny summary judgment on this claim as it applies to defendants Lambert and Mazuran; summary judgment is granted as to all other named defendants to this claim. "Where a party is responsible for providing false information or manufactured evidence that influences a decision whether to prosecute, he may be held liable for malicious prosecution." [71] While Lambert's and Mazuran's testimony provided reasonable grounds for making the arrest, taking all the evidence in the light most favorable to Gibbons, there is a factual dispute as to whether these two defendants planted evidence in Gibbons' home and falsely pursued the prosecution, demonstrating malice. To be clear, the court does not believe that evidence was planted in this case. To the contrary, the court strongly believes evidence was *not* planted. There is powerful evidence that Gibbons repeatedly used drugs in his home. The only issue before the court at the time, however, is whether Gibbons has some direct evidence that could be reasonably interpreted as sug-

---

**66.** *Taylor v. Meacham,* 82 F.3d 1556, 1561 (10th Cir.1996), *cert. denied,* 519 U.S. 871, 117 S.Ct. 186, 136 L.Ed.2d 125 (1996).

**67.** *Id.*

**68.** *See Pierce v. Gilchrist,* 359 F.3d 1279 (10th Cir.2004).

**69.** *Hodges v. Gibson Prods. Co.,* 811 P.2d 151, 158 (Utah 1991).

**70.** *Haywood,* 999 F.Supp. at 1461 (citing *Hodges,* 811 P.2d at 156).

**71.** *Chimurenga v. City of New York,* 45 F.Supp.2d 337, 343 (S.D.N.Y.1999).

gesting methamphetamine was planted in his night stand drawer on June 21, 2001. Because there is a triable issue of fact on that narrow question, summary judgment must be denied on these claims.

Gibbons has presented more than simply his unsupported allegation that evidence was planted in his home. Gibbons' evidence includes a video taken by law enforcement soon after the search which fails to show the baggie in the night stand where the deputies testified it was found. He has also provided a digital photograph arguably taken after the video was recorded that does show the baggie present in the night stand. That photograph was taken by Officer Lambert. The officers have not explained this arguable discrepancy. Comparing the video to the photo taken after the video was recorded, there remains a factual dispute regarding the planting of evidence, and therefore, summary judgment is precluded on the malicious prosecution claim. Gibbons, however, has failed to provide the court with any evidence that anyone other than Officers Lambert and Mazuran (Mazuran was the officer who claims he found the baggie and Lambert took the digital photo that show the baggie in the night stand) was involved in the planting of evidence allegation. Therefore, all other defendants are dismissed as to this claim. Again, the court does believe the jury will ultimately find for Gibbons on this claim. To the contrary, the court believes the jury will in all likelihood rule for the officers. The court, however, recognizes that "[t]he credibility of the witnesses presented, as well as the weight of the evidence, is for the jury to determine and the court will not substitute

its judgment therefor." [72] Accordingly, this claim must be allowed to go forward.

## OTHER FOURTH AMENDMENT CLAIMS

### *No Probable Cause for Arrest*

In a § 1983 action of unlawful arrest, defendant law enforcement officers lose their shield of qualified immunity only if they could not have reasonably believed Gibbons' arrest was based on probable cause. The Fourth Amendment requires that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." [73] A warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed. [74]

■ Regardless of the court's finding that there remains a material dispute as to whether the baggie was planted, summary judgment is nonetheless granted on Gibbons' unlawful arrest claim. If the "planted" baggie—again, the court must place that evidence in a light most favorable to Gibbons—had been the only basis for his arrest, the defendants would have arguably lacked probable cause to arrest Gibbons That, however, is not the case. As referenced to earlier, the following items, in addition to the baggie, were seized from Gibbons' home on the day he was arrested: pornographic materials (magazines, videos, and dvds), a leather whip, three pairs of handcuffs, a vibrator, nitrous oxide cartridges, rave party paraphernalia, syringes, and six bottles of an unknown liquid. Considering that nitrous oxide cartridges, in certain circumstances, are labeled controlled substances, [75] finding them in Gib-

**72.** *Taylor v. Illinois*, 484 U.S. 400, 428, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988) (quoting *People v. Van Dyke*, 414 Ill. 251, 111 N.E.2d 165, 167 (1953)).

**73.** U.S. Const. amend IV.

**74.** *See United States v. Watson*, 423 U.S. 411, 417–24, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).

**75.** Utah Code Ann. § 58–37–4(2)(a)(vii).

bons' home provided a reasonable basis on which the arresting officer could believe that Gibbons committed or was committing an offense. Furthermore, in light of the many pornographic and other adult-oriented items found in Gibbons' house, most of which were accessible to Gibbons 15–year old daughter, it was reasonable for the arresting officer to believe that Gibbons had dealt harmful material to his minor daughter, a violation of Utah law.[76] Therefore, because law enforcement officers found evidence beyond the baggie to support their belief that Gibbons had committed a crime, his claim for wrongful arrest cannot survive summary judgment.

### Illegal Search and Seizure of Hair, Blood, and Urine

The affidavit supporting the search warrant issued on June 22, 2001, was based on probable cause relating to the methamphetamine found in Gibbons' night stand. Because of the court's finding of a material dispute as to whether that methamphetamine was planted by certain defendants, summary judgment is denied as to Gibbons' claim that the search of his hair, blood, and urine violated his constitutional rights. For reasons set forth previously, however, summary judgment is granted as to all defendants other than Officers Lambert and Mazuran.

The court also rejects Gibbon's argument that because urine was not itemized in the blood and hair search warrant, that defendants exceeded the scope of the warrant. According to the evidence reports, law enforcement personnel seized blood, hair, and urine samples from Gibbons. The warrant did not include urine, but did authorize the taking of blood and hair samples. Having already performed the more intrusive task of taking blood, it was reasonable to believe that a far less-intrusive search—a urine sample—was also allowed.

### Excessive Force Claims

As part of his § 1983 action, Gibbons has claimed that certain defendants used excessive force in their search of his home and person on June 21, 2001. The first step in addressing an excessive force claim brought under § 1983 is to "identify[ ] the specific constitutional right allegedly infringed by the challenged application of force."[77] In this case, Gibbons rightfully rests his claim on the Fourth Amendment's protection against *unreasonable* seizures of the person.[78] "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Forth Amendment interests' 'against the countervailing governmental interests at stake.' "[79] The test is an objective one.[80]

Here, Gibbons bases his excessive force claim on the fact that law enforcement entered his home very early in the morning, with handguns and rifles drawn. Further facts supporting his claim are that he was ordered to the ground and felt a rifle nozzle pressing to his back. Lastly, he was handcuffed with his hands behind his

**76.** *Id.* at 76–10–1206.

**77.** *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

**78.** *Id.* at 395 ("[A]ll claims that law enforcement officers have used excessive force ... in the course of an arrest ... should be analyzed under the Fourth Amendment and its 'reasonableness standard', rather than under a 'substantive due process' approach.").

**79.** *Id.* at 396, 109 S.Ct. 1865 (quoting *Terry v. Ohio*, 392 U.S. 1, 8, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

**80.** *See Scott v. United States*, 436 U.S. 128, 137–39, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978).

body. Gibbons, however, has admitted that he was not physically injured and that within minutes of the sheriffs' entry, he had been handcuffed, allowed to dress, and was placed sitting on a couch. In light of the court's finding that probable cause existed to search Gibbons' home, the governmental interest in securing the area and protecting officers from potential danger was sufficient to justify the early morning search and the way in which the search was executed.[81] As for ordering him to the floor, handcuffing him, and pressing a gun to his back, the court finds that given the facts surrounding the search (possible multiple victims of sexual assaults, history of large number of guests in the home, and allegations of drug distribution), it was objectively reasonable for the officers to enter and restrain Gibbons in the manner they did. Consequently, Gibbons' excessive force claim is dismissed entirely as to all defendants.

### Perp Walk

The Fourth Amendment not only forbids unreasonable search and seizures, but also dictates that any searches and seizures must be carried out in a reasonable manner.[82] Gibbons claims his seizure (i.e., his arrest) was carried out unreasonably. In particular, Gibbons argues that by informing the media of his arrest and forcing him to walk in an area visible by television cameras and reporters, the law enforcement officers executed an unreasonable search and seizure.

In *Wilson v. Layne*, law enforcement allowed writers and photographers from the Washington Post to accompany them during a search of a home and arrest of its owner.[83] The photographer took numerous pictures while inside the home and the print reporter witnessed the confrontation between police and an individual who was living in the home.[84] The Court held that a media ride-along during the execution of an arrest warrant in a private home violated the Fourth Amendment.[85] In its reasoning, the court found that the presence of reporters in the home was not related to the objectives of the arrest, and rejected defendants' arguments that it nevertheless served legitimate police purposes.[86] Here, unlike in *Wilson*, the media did not enter Gibbons' home and did not take photographs or video of the search. Further, Gibbons has not produced sufficient evidence to support his claim that law enforcement allowed reporters onto Gibbons' property during the search. Instead, he argues that because of some video footage shown by a local television station showing the interior of his garage, one can "infer" that law enforcement allowed the media to enter Gibbons' property. Such speculative inferences cannot defeat a well-supported summary judgment motion.

In light of these distinguishing facts, there is no binding precedent upon which the court may base its decision regarding the validity of Gibbons' claim. Therefore, the court has looked to other circuits for guidance and agrees with the Second Circuit's two-step approach in *Lauro v. Charles* [87] which allowed a § 1983 claim to proceed against police who stage a "perp walk." In *Lauro*, after hearing of the media's interest in the investigation and

---

81. *See Thompson v. City of Lawrence*, 58 F.3d 1511, 1517 (10th Cir.1995).

82. *See Graham v. Connor*, 490 U.S. at 395, 109 S.Ct. 1865; *Lauro v. Charles*, 219 F.3d 202, 208 (2nd Cir.2000).

83. 526 U.S. 603, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999).

84. *See id.* at 607–08, 119 S.Ct. 1692.

85. *See id.* at 605, 119 S.Ct. 1692.

86. *See id.* at 612–14, 119 S.Ct. 1692.

87. *Lauro*, 219 F.3d at 211–13.

after having already taken Lauro to a station house, city police re-handcuffed Lauro and walked him out the front door and outside the station where several members of the media were waiting.[88] A police officer then placed Lauro in a police car, drove around the block, removed Lauro from the car, and walked him back into the same station house, again in front of cameras a reporters.[89]

*Lauro* announced a two-step approach for analyzing perp walk claims. First, the court must determine whether the perp walk intruded upon interests protected by the Fourth Amendment.[90] And second, if the court determines it did, it must then determine whether the perp walk was nevertheless reasonable in light of legitimate law enforcement purposes.[91] In this case, Gibbons was handcuffed and escorted outside his home by Officer Chow and quickly placed inside the sheriff's truck. While outside, video cameras rolled and reporters took down notes during the brief time Gibbons was waiting to enter Officer Chow's truck. Taking these facts into account and comparing them to facts from cases such as *Wilson* and *Lauro,* it is clear no Fourth Amendment interests were implicated; there was no delay in the arrest, and the media observed from a public place.

Even if Gibbons were successful in showing that the perp walk somehow marginally intruded upon his protected Fourth Amendment interests, the court still would find that the perp walk was nonetheless reasonable in light of legitimate law enforcement purposes. The allegations and evidence in this case dealt primarily with allegations of drug distribution to young women, several of which were minors.

Moreover, Officer Lambert received information from informants that lead him to suspect Gibbons' home was a safe-haven for illegal activity, including drug use and possible sexual assaults on young women while under the influence of alcohol and illegal substances. Considering the seriousness of the allegations and because many of the potential victims were unknown, the broadcast of Gibbons' face during the arrest was a legitimate law enforcement purpose because it served as notice to potential victims that an investigation against Gibbons was ongoing and that any further information was being requested. In addition to that purpose, the perp walk also made public law enforcement's efforts in dealing with what had become known as the "rave" scene—parties involving young people consuming a variety of illegal substances.

The court is aware that similar legitimate purposes were found to be insufficient by the Supreme Court in *Wilson.*[92] The Court's conclusion, however, was based on the high level of intrusiveness demonstrated by law enforcement; law enforcement allowed reporters and photographers to enter the home during the search and interrogation. "The reasons advanced by [law enforcement]," the Court stated, "taken in their entirety, fall short of justifying the presence of media inside a home." [93] Therefore, because the level of intrusiveness here was far from that in both *Wilson* and *Lauro,* and because several legitimate law enforcement purposes were served by having the media present to witness Gibbons being escorted from his house, defendants' motion for summary judgment on this Fourth Amendment

88. *See id.* at 204–05.

89. *See id.*

90. *See id.* at 211–13.

91. *See id.*

92. 526 U.S. at 612–14, 119 S.Ct. 1692.

93. *Id.* at 614, 119 S.Ct. 1692.

claim is granted as to all defendants other than Officers Lambert and Mazuran.

## SUBSTANTIVE DUE PROCESS CLAIMS

 Gibbons also claims that by planting evidence, destroying material evidence, tampering with a hair sample, failing to properly document evidence found during the June 21, 2001, search, and failing to return seized evidence, defendants violated his Fourteenth Amendment substantive due process rights. The obligations to disclose and preserve impeachment/exculpatory evidence are grounded in the due process right to a fair trial.[94] "Thus, the withholding or destruction of evidence violates a criminal defendant's constitutional rights only if, as a result of the withholding or destruction of evidence, the criminal defendant is denied a fair trial."[95] Because the only judgment the court entered in Gibbons' criminal case was a judgment of acquittal, Gibbons cannot be said to have been deprived of the right to a fair trial.[96] Consequently, defendants' motion for summary judgment on Gibbons' substantive due process claims relating to the destruction of evidence by Officer Stewart and any other Fourteenth Amendment claim alleging tampering of evidence is granted as to all defendants. Regarding Gibbons' claim that defendants have failed to return his personal property, defendants have represented to the court that all of defendants' property is being retained until the civil suit ends. Defen-

dants have promised the court that all Gibbons' property will be returned immediately upon the conclusion of the case and that defendants would be liable for any damage to the property that may occur while under defendants' watch. Retaining evidence during a lawsuit is proper; Gibbons' claim on this subject is dismissed as well.

## DAMAGE TO REPUTATION

Both parties have briefed the issue as to whether Gibbons can assert a defamation claim within his § 1983 action. The court agrees with Gibbons' argument that if raised properly, a defamation claim is proper under the "stigma-plus" test hinted to by the Supreme Court[97] and further articulated by several of the circuits.[98] The court, however, need not reach a conclusion as to whether Gibbons' defamation claim is proper because nowhere in his complaint does Gibbons allege such a cause of action. While two of the state claims previously dismissed by the court dealt with Gibbons' alleged damage to reputation—intrusion and false light—Gibbons never stated a federal claim for defamation. Rather, Gibbons, in his complaint, has only asserted that his reputation has been injured as proof of damages. In light of the court's order that the issues of liability and damages be tried separately, and because Gibbons failed to allege a federal defamation claim in his complaint, the court need not rule on this issue be-

---

**94.** *See Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *United States v. Bagley,* 473 U.S. 667, 678, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *United States v. Agurs,* 427 U.S. 97, 104, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

**95.** *Morgan v. Gertz,* 166 F.3d 1307, 1310 (10th Cir.1999).

**96.** *Id.* ("Regardless of any misconduct by government agents before or during trial, a de-

fendant who is acquitted cannot be said to have been deprived of the right to a fair trial.").

**97.** *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976).

**98.** *See Cooper v. Dupnik,* 924 F.2d 1520 (9th Cir.1991); *Marrero v. City of Hialeah,* 625 F.2d 499 (5th Cir.1980).

cause it was not properly presented. The court will, therefore, reserve its conclusions regarding any damage Gibbons' reputation may have suffered for the damage portion of the case.

## CONCLUSION

To summarize, Gibbons has failed to demonstrate that there remains a genuine issue of material fact as to the existence of probable cause. Gibbons has, however, successfully shouldered his burden of providing evidence that, taken in the light most favorable to him, could lead a reasonable trier of fact to conclude that Officers Lambert and Mazuran violated his Fourth Amendment protection from an unlawful arrest by planting a baggie containing methamphetamine during an otherwise lawful search.

The court does not believe the baggie was planted—to the contrary, the court believes no baggie was planted. The issue, however, must be decided by a jury. In light of this surviving allegation, several other claims must remain, but only as to Officers Lambert and Mazuran. All other defendants are entitled to summary judgment based on either absolute immunity, a good faith defense, or simply Gibbons' failure to support his claims with more than just a scintilla of evidence [167–1].

Lastly, with regard to Gibbons' motion to strike the court's use of the deposition testimony of John Wester [219–1], the court did not significantly rely upon Wester's deposition in making its determination. And to clarify, the court originally sought Wester's deposition in an effort find further support for *Gibbons'* attempt to overcome defendants' motion for summary judgment—the court burdened the defendants with the task of supplying the deposition since they were the moving party. In sum, the court's decision today would be no different had it not summoned Wester's deposition.

As a consequence of the court's holding, there remains the legally complex and fact-intensive issue of damages. Therefore, as allowed under Federal Rule of Civil Procedure 42(b), the court hereby orders that all issues relating to damages be bifurcated from proceedings in which liability will be determined and subsequently addressed in separate proceedings in the instance that a jury finds Officer Lambert of Officer Mazuran liable on any of the remaining claims.